## In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION
### MDL NO. 381.

Nos. 1140, 1141, 1097, 1139, 1081, 1134, 1135, 1100, 1101, 1098, 1099, 1105, 1106, 1102, 1103, 1115, 1119, 1136, 1122, 1123, 1124, 1130, 1133, 1127, 1129, Docket Nos. 84–6273, 84–6321, 85–6035, 85–6051, 85–6083, 85–6261, 85–6265, 85–6301, 86–6303, 85–6307, 86–6323, 86–6325, 86–6327, 86–6329, 85–6335, 85–6349, 85–6371, 85–6373, 85–6379, 85–6381, 85–6385, 85–6387, 85–6393, 85–6395, 85–6411.

United States Court of Appeals, Second Circuit.

Argued April 9, 1986.

Decided April 21, 1987.

Sherman L. Cohn, Robert A. Taylor, Jr., Washington, D.C.; Richard L. Steagall, Peoria, Ill.; Benton Musslewhite, Houston, Tex., Avram G. Adler, Francis Kelly, Philadelphia, Pa. (Ashcraft & Gerel, Washington, D.C.; Nicoara & Steagall, Peoria, Ill.; Adler & Kops, Philadelphia, Pa.; James H. Brannon, Jamison & Brannon, Houston, Tex.; Joel Rome, Rome & Glaberson, Philadelphia, Pa.; Marlene Penny Maynes, Cincinnati, Ohio; Richard D. Heidemen, Louisville, Ky.; Stephen L. Toney, Werner, Beyer, Lindgren & Toney, New London, Wis.; Richard Ellison, Cincinnati, Ohio; James C. Barber, Dallas, Tex.; William Beatty, Granite City, Ill.; John T. McKnight, Brunswick, Ga.; Richard L. Gill, Gill & Brinkman, St. Paul, Minn.; James H. Davis, Los Angeles, Cal.; Kenneth R. Yoffey, Newport News, Va.; Richard L. Powell, Augusta, Ga.; Joseph H. Latchum, Jr., Watkins, Chase, Latchum & Williams, Hampton, Va.; Lula Abdul-Rahim, Duda, Rahim & Rotto, Oakland, Cal.; Robert D. Gary, Gary & Duff, Lorain, Ohio; J. Edward Allen, Forston, Bentley & Griffin, Athens, Ga.; Charles O. Fisher, Walsh & Fisher, Westminster, Md.; William J. Risner, Tucson, Ariz.; Walter L. Blair, Blair & Starks, Charles Town, W.Va.; Janet Frazier Phillips, Las Vegas, Nev.; Russell Smith, Laybourne, Smith, Gore, Akron, Ohio; H. Muldrow Etheredge, New Orleans, La.; Ford S. Reiche, Barrett, Reiche & Sheehan, Portland, Me.; Sara Hayes, Gage & Tucker, Kansas City, Mo.; William Jorden, Jorden & White, Meadville, Pa.; Eugene P. Cicardo, Alexandria, La.; Carry R. Dettloff, Kistner, Schienke, Staugaard, Warren, Michigan; James H. Bjorum, Cox, Dodson & Bjorum, Corpus Christi, Tex.; Jack E. London, Hollywood, Fla.; James T. Davis, Davis & Davis, Uniontown, Pa.; Robert W. Kagler, Moundsville, W.Va.; Michael Radbill, Philadelphia, Pa.; William T. Robinson, III, Robinson, Arnzen, Parry, Covington, Ky.; William Jarblum, Jarblum & Solomon, New York City; John R. Mitchell, Charleston, W.Va.; Dennis A. Koltun, Miami, Fla., of counsel), for plaintiffs-appellants objectors to the class settlement.

John C. Sabetta, Townley & Updike, New York City for appellee Monsanto Co.

George D. Reycraft, Cadwalader, Wickersham & Taft, New York City, for appellee Diamond Shamrock Chemicals Co.

Rivkin, Radler, Dunne & Bayh, Garden City, N.Y., for appellee The Dow Chemical Co.

Kelley Drye & Warren, New York City, for appellee Hercules Inc.

Clark, Gagliardi & Miller, White Plains, N.Y., for appellee TH Agriculture & Nutrition Co., Inc.

Shea & Gould, New York City, for appellee Uniroyal, Inc.

Budd Larner Kent Gross Picillo Rosenbaum Greenberg & Sade, Short Hills, N.J., for appellee Thompson Chemicals Corp.

Lawrence G. Sager, New York City; Stephen J. Schlegel, Chicago, Ill. (Irving Like, Reilly, Like & Schneider, Babylon, N.Y.; Edward F. Hayes, III, Abruzzo, Clancy & Hayes, Huntington, N.Y.; Clayton P. Gillette, Boston, Mass.; Thomas W. Henderson, Henderson & Goldberg, Pittsburgh, Pa.; David J. Dean, Dean, Falanga & Rose, Carle Place, N.Y.; Gene Locks, Greitzer & Locks, Philadelphia, Pa.; Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio; Newton B. Schwartz, Houston, Tex.; Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molligan,

San Francisco, Cal.; John O'Quinn, O'Quinn & Hagans, Houston, Tex., of counsel), for appellee plaintiffs' Management Committee.

Before VAN GRAAFEILAND, WINTER, and MINER, Circuit Judges.

WINTER, Circuit Judge:

This is the first of nine opinions, all filed on this date, dealing with appeals from Judge Pratt's and Chief Judge Weinstein's various decisions in this multidistrict litigation and class action. This opinion begins with a section entitled "Overview and Summary of Rulings" that summarizes the entire case and all of our decisions. The next section, "Detailed History of Proceedings," gives the background for all of the appeals. Familiarity with this section may be necessary to understand the various opinions that follow. The present opinion also contains our rulings regarding the certification of a class action and the approval of the settlement between the plaintiff class and the defendant chemical companies. Two other opinions by this author review the propriety of the distribution scheme for the resultant fund and the grant of summary judgment against those plaintiffs who opted out of the class action. Three opinions by Judge Van Graafeiland resolve issues concerning the liability of the United States to veterans, their families, and the chemical companies. A fourth opinion by Judge Van Graafeiland reviews the dismissal of actions brought by civilian plaintiffs against the United States and the chemical companies. Two opinions by Judge Miner resolve issues concerning the validity of a fee agreement among the members of the Plaintiffs' Management Committee ("PMC") and the district court's award of attorneys' fees.

Most of the appeals in this litigation were argued on April 9–10, 1986. The appeal from the adoption of the distribution scheme, however, was not taken until August 19, 1986 and was not argued until October 1. Because the issues raised by the latter appeal were in many ways interrelated with those argued in April, the panel had to suspend consideration of these matters until it heard the arguments in October.

## I. OVERVIEW AND SUMMARY OF RULINGS

By any measure, this is an extraordinary piece of litigation. It concerns the liability of several major chemical companies and the United States government for injuries to members of the United States, Australian, and New Zealand armed forces and their families. These injuries were allegedly suffered as a result of the servicepersons' exposure to the herbicide Agent Orange while in Vietnam.

Agent Orange, which contains trace elements of the toxic by-product dioxin, was purchased by the United States government from the chemical companies and sprayed on various areas in South Vietnam on orders of United States military commanders. The spraying generally was intended to defoliate areas in order to reduce the military advantage afforded enemy forces by the jungle and to destroy enemy food supplies.

We are a court of law, and we must address and decide the issues raised as legal issues. We do take note, however, of the nationwide interest in this litigation and the strong emotions these proceedings have generated among Vietnam veterans and their families. The correspondence to the court, the extensive hearings held throughout the nation by the district court concerning the class settlement with the chemical companies, and even the arguments of counsel amply demonstrate that this litigation is viewed by many as something more than an action for damages for personal injuries. To some, it is a method of public protest at perceived national indifference to Vietnam veterans; to others, an organizational rallying point for those veterans. Thus, although the precise legal claim is one for damages for personal injuries, the district court accurately noted that the plaintiffs were also seeking "larger remedies and emotional compensation" that were beyond its power to award. *In re "Agent Orange" Product Liability Litigation*, 597 F.Supp. 740, 747 (E.D.N.Y.1984).

Central to the litigation are the many Vietnam veterans and their families who have encountered grievous medical problems. It is human nature for persons who face cancer in themselves or serious birth defects in their children to search for the causes of these personal tragedies. Well-publicized allegations about Agent Orange have led many such veterans and their families to believe that the herbicide is the source of their current grief. That grief is hardly assuaged by the fact that contact with the herbicide occurred while they were serving their country in circumstances that were unpleasant at best, excruciating at worst.

When the case is viewed as a legal action for personal injury sounding in tort, however—and we are bound by our oaths to so view it—the most noticeable fact is the pervasive factual and legal doubt that surrounds the plaintiffs' claims. Indeed, the clear weight of scientific evidence casts grave doubt on the capacity of Agent Orange to injure human beings. Epidemiological studies of Vietnam veterans, many of which were undertaken by the United States, Australian, and various state governments, demonstrate no greater incidence of relevant ailments among veterans or their families than among any other group. To an individual plaintiff, a serious ailment will seem highly unusual. For example, the very existence of a birth defect may persuade grieving parents as to Agent Orange's guilt. However, a trier of fact must confront the statistical probability that thousands of birth defects in children born to a group the size of the plaintiff class might not be unusual even absent exposure to Agent Orange. A trier of fact must also confront the fact that there is almost no evidence, even in studies involving animals, that exposure of males to dioxin causes birth defects in their children.

Both the Veterans' Administration and the Congress have treated the epidemiological studies as authoritative. Although such studies do not exclude the possibility of injury and settle nothing at all as to future effects, they offer little scientific basis for believing that Agent Orange caused any injury to military personnel or their families. The scientific basis for the plaintiffs' case consists of studies of animals and industrial accidents involving dioxin. Differences in the species examined and nature of exposure facially undermine the significance of these studies when compared with studies of the veterans themselves.

Proving that the ailments of a particular individual were caused by Agent Orange is also extremely difficult. Indeed, in granting summary judgment against those plaintiffs who opted out of the class action (the "optouts"), the district court essentially held that such proof was presently impossible. The first evidentiary hurdle for such an individual is to prove exposure to Agent Orange, an event years past that at the time did not carry its current significance. Such evidence generally consists only of oral testimony as to an individual's remembering having been sprayed while on the ground and/or having consumed food and water in areas where spraying took place. The second and, in the view of the district court, insurmountable hurdle is to prove that the individual's exposure to Agent Orange caused the particular ailment later encountered. Plaintiffs do not claim that Agent Orange causes ailments that are not found in the population generally and that cannot result from causes known and unknown other than exposure to dioxin. Plaintiffs' proof of causation would consist largely of inferences drawn from the existence of an ailment, exposure to Agent Orange, and medical opinion as to a causal relationship. However, the difficulties in excluding known causes, such as undetected exposure to the same or similar toxic substances in civilian life, and the conceded existence of unknown causes might make it difficult for any plaintiff to persuade a trier of fact as to Agent Orange's guilt. Causation is nevertheless an absolutely indispensable element of each plaintiff's claim.

The plaintiffs' claims are further complicated by the fact that an individual's exposure to Agent Orange cannot be traced to a particular defendant because the military mixed the Agent Orange produced by vari-

ous companies in identical, unlabeled barrels. No one can determine, therefore, whether a particular instance of spraying involved a particular defendant's product. In addition, the Agent Orange produced by some defendants had a considerably higher dioxin content than that produced by others. Because the alleged ailments may be related to the amount of dioxin to which an individual was exposed, it is conceivable that if Agent Orange did cause injury, only the products of certain companies could have done so.

Difficult legal problems also arise from the considerable uncertainty as to which product liability rules and statutes of limitations apply to the various plaintiffs. The plaintiffs come from throughout the United States, Australia, and New Zealand, and each would face difficult choice of law problems that might be resolved adversely to their claims.

Finally, doubt about the strength of the plaintiffs' claims exists because of the so-called military contractor defense. The chemical companies sold Agent Orange to the United States government, which used it in waging war against enemy forces seeking control of South Vietnam. It would be anomalous for a company to be held liable by a state or federal court for selling a product ordered by the federal government, particularly when the company could not control the use of that product. Moreover, military activities involve high stakes, and common concepts of risk averseness are of no relevance. To expose private companies generally to lawsuits for injuries arising out of the deliberately risky activities of the military would greatly impair the procurement process and perhaps national security itself.

An illustration of the many factual and legal difficulties facing the plaintiffs is the dispute among their counsel as to how many "serious" or "strong" claims there are. The Plaintiffs' Management Committee ("PMC") estimates a much smaller number than do counsel for the class members who object to the settlement. Neither group has hard evidence to support its estimates. If by "serious" or "strong" one

means a case likely to prevail on liability and to result in a substantial damage award, then we believe that every plaintiff would encounter difficulties in proving causation and even graver problems in overcoming the military contractor defense. If a case is considered "serious" or "strong" because the plaintiff has grave ailments or has died, then such cases do exist although their numbers remain in doubt. What is not in doubt is that the widespread publicity given allegations about Agent Orange have led to an enormous number of claims alleging a large variety of highly common ailments. The illnesses claimants now attribute to Agent Orange include not only heart disease, cancer, and birth defects, but also confusion, fatigue, anxiety, and spotty tanning.

The procedural aspects of this litigation are also extraordinary. Chief Judge Weinstein certified it as a class action at the behest of most of the plaintiffs and over the objections of all of the defendants. Certain issues, such as the damage suffered by each plaintiff, were not, of course, to be determined in the class action. Instead, they were to be left to individual trials if the outcome of the class action proceedings was favorable to the plaintiffs. Some plaintiffs opted out of the class action, but their cases remained in the Eastern District of New York as part of a multidistrict referral.

The class certification and settlement caused the number of claimants and the variety of ailments attributed to Agent Orange to climb dramatically. It also has caused disunity among the plaintiffs and increased the controversy surrounding this case. Correspondence to this court indicates that many of the original plaintiffs, most of whom joined the motions for class certification, were never advised that use of the class action device might lead to their being represented by counsel whom they did not select and who could settle the case without consulting them. In the midst of this litigation, original class counsel, Yannacone & Associates, asked to be relieved for financial reasons. Control of the class action soon passed to the PMC. Six of the nine members of the PMC ad-

vanced money for expenses at a time when the plaintiffs' case, already weak on the law and the facts, was near collapse for lack of resources. This money was furnished under an agreement that provided that three times the amount advanced by each lawyer would be repaid from an eventual fee award. These payments would have priority, moreover, over payments for legal work done on the case.

The trial date set by Chief Judge Weinstein put the parties under great pressure, and just before the trial was to start, the defendants reached a $180 million settlement with the PMC. The size of the settlement seems extraordinary. However, given the serious nature of many of the various ailments and birth defects plaintiffs attributed to Agent Orange, the understandable sympathy a jury would have for the particular plaintiffs, and the large number of claimants, 240,000, the settlement was essentially a payment of nuisance value. Although the chances of the chemical companies' ultimately having to pay any damages may have been slim, they were exposed potentially to billions of dollars in damages if liability was established and millions in attorneys' fees merely to continue the litigation.

The district judge approved the settlement. It is clear that he viewed the plaintiffs' case as so weak as to be virtually baseless. Indeed, shortly after the settlement, he granted summary judgment against the plaintiffs who opted out of the class action on the grounds that they could not prove that a particular ailment was caused by Agent Orange and that their claims were barred by the military contractor defense.

In addition, Chief Judge Weinstein awarded counsel fees in an amount that was considerably smaller than had been requested by the attorneys involved. The size of the award was clearly influenced by his skepticism about whether the case should ever have been brought.

The final extraordinary aspect of this case is the scheme adopted by Chief Judge Weinstein to distribute the class settlement award. That scheme, which is described as "compensation-based" rather than "tort-based," allows veterans who served in areas in which the herbicide was sprayed and who meet the Social Security Act's definition of disabled to collect benefits up to a ceiling of $12,000. Smaller payments are provided to the survivors of veterans who served in such areas. No proof of causation by Agent Orange is required, although benefits are available only for non-traumatic disability or death. The distribution scheme also provides for the funding of a foundation to undertake projects thought to be helpful to members of the class.

Many of the decisions of the district court were appealed, and we summarize our rulings here. In this opinion, we reject the various challenges to the certification of a class action. Although we share the prevalent skepticism about the usefulness of the class action device in mass tort litigation, we believe that its use was justified here in light of the centrality of the military contractor defense to the claims of all plaintiffs. We also approve the settlement in light of both the pervasive difficulties faced by plaintiffs in establishing liability and our conviction that the military contractor defense absolved the chemical companies of any liability. In a second opinion by this author, 818 F.2d 179, we affirm the distribution scheme's provision for disability and death benefits to veterans exposed to Agent Orange and their survivors. We reverse the scheme's establishment of a foundation; however, the district court may on remand fund and supervise particular projects it finds to be of benefit to the class. A third opinion by this author, 818 F.2d 187, affirms the grant of summary judgment against the opt-out plaintiffs based on the military contractor defense. On two grounds we hold that the chemical companies did not breach any duty to inform the government of Agent Orange's hazardous properties. First, at the times relevant here, the government had as much information about the potential hazards of dioxin as did the chemical companies. Second, the weight of present scientific evidence does not establish that Agent Orange caused injury to personnel in Vietnam. The chemi-

cal companies did not breach any duty to inform the government and are therefore not liable to the opt-outs.

In an opinion by Judge Van Graafeiland, 818 F.2d 194, we affirm the district court's dismissal of actions against the United States by veterans on the grounds that they are barred by the *Feres* doctrine and the discretionary function exception to the Federal Tort Claims Act. A second opinion by Judge Van Graafeiland, 818 F.2d 204, affirms the dismissal of an action against the United States by the chemical companies seeking contribution or indemnity for the $180 million they paid in settling with the plaintiff class. A third opinion, 818 F.2d 210, affirms the dismissal of civilian actions against the United States on discretionary function grounds and of similar actions against the chemical companies on statute of limitations and military contractor defense grounds. A final opinion by the same author, 818 F.2d 201, affirms the dismissal of the so-called "direct" claims by families of veterans against the government on *Feres* and discretionary function grounds.

An opinion by Judge Miner, 818 F.2d 216, invalidates the PMC members' agreement to repay on an "up front" basis treble the expenses that any of them advanced. We hold that this agreement creates a conflict of interest between the attorneys and the class by generating impermissible incentives to settle. A second opinion by Judge Miner, 818 F.2d 226, affirms the district court's award of counsel fees except with regard to the abrogation of one fee award.

## II. DETAILED HISTORY OF PROCEEDINGS

### 1) *Early Proceedings*

Plaintiffs allegedly were exposed to the herbicide Agent Orange as a consequence of efforts undertaken by the United States military forces to defoliate the jungle in Vietnam. One purpose of this defoliation project, known as "Operation Ranch Hand," was to clear away foliage near supply transport lines, power lines, and military bases, and thus deprive enemy forces of protective cover. The herbicide was also used to destroy crops available to the enemy. Some plaintiffs claim to have been directly exposed to the herbicide, while others claim that it contaminated the food and water they consumed or the ground on which they slept.

Although various herbicides were used during the war, Agent Orange was thought to be best suited for the military's purposes and was used most frequently. Agent Orange was a mixture of the herbicides known as 2,4-D and 2,4,5-T.[1] The manufacture of 2,4,5-T is said inevitably to result in the production of dioxin, which is alleged to be a highly toxic substance. Whether the trace elements of dioxin in Agent Orange were hazardous to persons in sprayed areas is sharply disputed. Indeed, the toxicity of dioxin itself remains a controversial issue. *See generally* P. Schuck, *Agent Orange on Trial* 16–24 (1986); M. Gough, *Dioxin, Agent Orange* (1986).

The Agent Orange litigation began in July 1978, with the filing of a lawsuit by Vietnam veteran Paul Reutershan, now deceased, in Supreme Court, New York County. The defendants were several chemical companies alleged to have manufactured Agent Orange. That case was removed to federal court and then transferred to the Eastern District of New York. On January 8, 1979, Reutershan's estate filed an amended complaint seeking relief on behalf of a class of veterans and their families injured by Agent Orange. Several other complaints alleging similar class claims were filed in late 1978 and early 1979. In March 1979, counsel for Reutershan's estate and for defendant Dow Chemical Co. jointly petitioned pursuant to 28 U.S.C. § 1407(c) (1982) for the establishment of a multidistrict litigation proceeding. The Judicial Panel on Multidistrict Litigation es-

---

**1.** "2,4–D" and "2,4,5–T" are the abbreviated names of 2,4–Dichlorophenoxyacetic acid and 2,4,5–Trichlorophenoxyacetic acid, respectively.

tablished *In re "Agent Orange" Product Liability Litigation,* MDL No. 381, in the Eastern District of New York. The first cases were transferred to the Eastern District on May 8, 1979, and nearly 600 cases have since been transferred. MDL No. 381 was assigned to then District Judge Pratt.

The third amended class complaint in the case designated by the court as the lead action alleged federal question jurisdiction under the "common law and/or the statutory laws of the United States." Defendants moved to dismiss this complaint for want of subject matter jurisdiction. Judge Pratt adopted the federal common law theory and accordingly denied the motion. *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 737, 743–49 (E.D.N.Y. 1979). However, a divided panel of this court reversed. *In re "Agent Orange" Product Liability Litigation,* 635 F.2d 987 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). The class action thereafter proceeded in federal court solely on the basis of diversity jurisdiction under 28 U.S.C. § 1332 (1982).

Defendants next moved for summary judgment based on the so-called military contractor defense. The motion contended that the plaintiffs' claims against the chemical manufacturers were barred on the grounds:

(1) that they merely manufactured and supplied Agent Orange to the government pursuant to validly authorized contracts[;] (2) that Agent Orange was not manufactured before and has not been manufactured since; (3) that they completed their compelled manufacture of Agent Orange in strict compliance with the specifications supplied by the government, specifications that contained no obvious or "glaring" defects that would have alerted the defendants of any impending danger in following them; and (4) that they manufactured Agent Orange without any negligence on their part.

*In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762, 795 (E.D.N.Y. 1980).

Although Judge Pratt stated that this defense might be available to the defendants, *id.* at 796, he denied defendants' motion on the ground that their own descriptions of their contract performance and their relationship to the government raised issues of fact requiring a trial. *Id.*

Judge Pratt planned to hold an initial trial on the military contractor defense and allowed discovery on this issue. He stated:

> The elements of the defense will be uniquely adapted to consideration and adjudication, separate and apart from the issues of liability, causation and damages. As a practical matter, discovery as to these discrete issues will be rather narrow compared to the discovery that some of the other fact issues presented by this action may require.

*Id.*

In addition, Judge Pratt stated his intention to certify a class pursuant to Fed.R. Civ.P. 23(b)(3) of "persons who claim injury from exposure to Agent Orange and their spouses, children and parents who claim direct or derivative injury therefrom." *Id.* at 788. He noted that "it may later prove advantageous to create subclasses for various purposes." *Id.* Judge Pratt rejected plaintiffs' request for certification of a "limited fund" class action pursuant to Fed.R.Civ.P. 23(b)(1)(B), on the ground that plaintiffs had failed to offer evidence that the defendants were likely to become insolvent if held liable for plaintiffs' injuries. *Id.* at 789–90.

Following eleven months of discovery, defendants Hercules, Thompson Chemical, Riverdale Chemical, Hoffman-Taft, Dow Chemical, TH Agriculture and Nutrition, and Uniroyal again moved for summary judgment on the military contractor defense. Defendants Monsanto and Diamond Shamrock did not join in the motion. Judge Pratt granted summary judgment to Hercules, Thompson Chemical, Riverdale Chemical, and Hoffman-Taft, but denied the motions of Dow Chemical, TH Agriculture and Nutrition, and Uniroyal. *In re "Agent Orange" Product Liability Litigation,* 565 F.Supp. 1263 (E.D.N.Y.1983). He also concluded that the planned separate

trial on the military contractor defense was not desirable. He noted that discovery and argument of motions on the military contractor defense had revealed that the defense implicated factual issues also central to both liability and causation and thus should not be tried separately. Subsequently, defendants Hercules and Thompson Chemical were reinstated as defendants.

In 1980, Yannacone & Associates, a consortium of lawyers who banded together for purposes of this litigation, was designated lead counsel for the representatives of the plaintiff class. *See* 506 F.Supp. at 788 n. 32. In 1983, the firm of Ashcraft & Gerel and attorneys Benton Musslewhite, Steven Schlegel, and Thomas Henderson joined Yannacone & Associates as lead counsel for the representatives of the class. In September 1983, Yannacone & Associates moved to be relieved of its duties as class counsel, citing an inability to bear the costs associated with the litigation. This motion was granted. Ashcraft & Gerel sought to gain control of the case but failed to do so and withdrew as class counsel. As we describe *infra*, Musslewhite, Schlegel, and Henderson then recruited additional attorneys to the PMC. *See generally* Schuck, *Agent Orange on Trial* at 73–77, 94–95, 102–110. Although not a member of the PMC, Ashcraft & Gerel has continued to represent plaintiffs who have opted out of the class action, certain civilian plaintiffs, and certain class members who object to the settlement.

### 2) *Class Certification*

Judge Pratt's duties as a newly-appointed member of this court precluded him from continuing as trial judge, and in October 1983, Chief Judge Weinstein assumed responsibility for MDL No. 381. After conferring with the parties, he ordered the trial of the class claims to begin on May 7, 1984. He formally certified a Rule 23(b)(3) class, finding

(1) that the affirmative defenses and the question of general causation are common to the class, (2) that those questions predominate over any questions affecting individual members, and (3) given the enormous potential size of plaintiffs' case and the judicial economies that would result from a class trial, a class action is superior to all other methods for a "fair and efficient adjudication of the controversy."

*In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 724 (E.D.N.Y. 1983) ("*Class Certification Opinion* ").

Chief Judge Weinstein defined the plaintiff class as

those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange or other phenoxy herbicides, including those composed in whole or in part of 2,4,5–trichlorophenoxyacetic acid or containing some amount of 2,3,7,8–tetrachlorodibenzo-p-dioxin. The class also includes spouses, parents, and children of the veterans born before January 1, 1984, directly or derivatively injured as a result of the exposure.

*Id.* at 729.

In addition, Chief Judge Weinstein certified a Rule 23(b)(1)(B) mandatory class on the issue of punitive damages, though not on the ground, previously rejected by Judge Pratt, that the claims against the defendants could render them insolvent. Rather, he reasoned that because the purpose of punitive damages is not to compensate but to punish, some limits should be imposed on the amount of punishment meted out to the defendants for a single transaction. *See Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 838–42 (2d Cir. 1967) (Friendly, J.). Chief Judge Weinstein reasoned that punitive damages might be awarded, if at all, only to the first plaintiffs to receive a judgment. He concluded that

it would be equitable to share [a punitive damage award] among all plaintiffs who ultimately recover compensatory damages. Yet, if no class is certified under Rule [23](b)(1)(B), non-class members who opt out under Rule 23(b)(3) would conceivably receive all of the punitive

damages or, if their cases are not completed first, none at all.

100 F.R.D. at 728.

Chief Judge Weinstein also required that plaintiffs' counsel, at their own expense, provide notice to the members of the class as follows:

(1) Written notice was to be mailed to (a) all persons who had filed actions in the federal district courts, or had filed actions in state courts later removed to federal court, that were pending in or transferred to the Eastern District; (b) all persons who had intervened or sought to do so; (c) each class member then represented by counsel associated with the PMC who had not yet commenced an action or sought to intervene; (d) all persons then listed on the United States Government's Veterans' Administration "Agent Orange Registry";

(2) Announcements were to be sent to the major radio and television networks, and to radio stations with a combined coverage of at least one half of the audience in each of the top 100 radio markets;

(3) Notice was to be published in certain leading national newspapers and magazines, in servicepersons' publications, and in newspapers in Australia and New Zealand;

(4) A toll-free "800" telephone number was to be obtained and staffed by persons who would provide callers with basic information about the litigation;

(5) Notice was to be sent to each state governor requesting that he or she refer the notice to any state agency dealing with the problems of Vietnam veterans.

The notice sent to individual veterans, reprinted in the appendix to this opinion, informed potential class members of the pendency of the class action and their right to opt out of the Rule 23(b)(3) class. The notice made clear that exclusion could be effectuated only by written request, and an "Exclusion Request Form" was attached to the notice for convenience.

Following certification of the two classes, the defendants petitioned this court for a writ of mandamus to compel the district court to vacate certification of the classes. *See In re Diamond Shamrock Chemicals Co.*, 725 F.2d 858 (2d Cir.), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). In denying the petition, we noted that "mandamus is an extraordinary remedy," *id.* at 859, and that "[r]eview of the many issues raised by the class certification will be available when the ramifications of each aspect of the ruling will be evident." *Id.* at 862. We also stated that "it seems likely that some common issues, which stem from the unique fact that the alleged damage was caused by a product sold by private manufacturers under contract to the government for use in a war, can be disposed of in a single trial. The resolution of some of these issues in defendants' favor may end the litigation entirely." *Id.* at 860–61. We further observed that the notice required was at least arguably the best practicable under the circumstances. *Id.* at 862.

Various plaintiffs, as a means of challenging the settlement, now appeal from the class certification. They contend that the district court lacked subject matter jurisdiction, that there were insufficient common questions of law and fact to justify certification, and that the notice was inadequate.

### 3) *The Settlement*

In April 1984, Chief Judge Weinstein appointed three special masters—Leonard Garment, Kenneth Feinberg, and David Shapiro—to assist in negotiations over a settlement of the class action. These negotiations intensified during the weekend before trial. *See* Schuck, *Agent Orange on Trial* at 49–66. On May 7, 1984, the day the trial was to have begun, the class representatives and the chemical companies agreed to settle the class claims for $180 million. Thereafter, Chief Judge Weinstein conducted eleven days of hearings on the proposed settlement in New York, Atlanta, Houston, Chicago, and San Francisco. At these hearings, nearly 500 witnesses addressed the fairness of the settlement. Chief Judge Weinstein also considered "hundreds of written communications from veterans, members of their families, veter-

ans' organizations and others ... and read a large part of the relevant literature, taking judicial notice of its substance." *In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740, 748 (E.D.N.Y.1984) (*"Settlement Opinion"*).

By May 6, 1984, the day before the settlement was reached, some 2,440 class members had opted out of the Rule 23(b)(3) class action by filing requests for exclusion. The settlement agreement provided for a period during which persons who had opted out of the class could be reinstated as class members if they filed a request with the district court. Settlement Agreement ¶ 8, *id.* at 865. Some 600 such requests were received. Chief Judge Weinstein stated that he would consider late applications to rejoin the class "sympathetically." *Id.* at 757.

In a lengthy opinion, reported at 597 F.Supp. 740 (E.D.N.Y.1984), Chief Judge Weinstein approved the settlement subject to hearings on counsel fees and preliminary consideration of plans for distribution of the settlement proceeds. Various members of the class appeal from the approval of the settlement on the ground that the $180 million award is inadequate.

### 4) *Counsel Fees*

By late 1983, the three remaining members of the PMC—Schlegel, Musslewhite, and Henderson—found that they lacked the resources necessary to continue the litigation. In order to attract new members both to finance and staff the lawsuit, the members of the PMC entered into an agreement whereby those members who advanced money for expenses were to be repaid at three times the amount of money advanced "off the top" out of any award of counsel fees. The agreement also established a formula, later rescinded, by which the remainder of the fee award was to be distributed among the PMC members. As a result, those who had advanced money for expenses in return for a trebled repayment controlled six of the nine PMC votes. Chief Judge Weinstein was not informed of this agreement until after the case had been settled.

After the settlement, more than 100 applications for attorneys' fees and expenses were submitted to the district court. Hearings on these applications were held on September 26 and October 1, 1984. On June 18, 1985, Chief Judge Weinstein issued an amended order awarding a total of $10,767,443.63 in fees and expenses to 88 law firms and individual lawyers for their work on behalf of the class. *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1344–46 (E.D.N.Y.1985). The district court followed the so-called "lodestar" approach to attorneys' fees awards, *see City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974) (*"Grinnell I"*), and *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir.1977) (*" Grinnell II "*), using national hourly rates of $150 for partners, $125 for law professors, and $100 for associates. The court increased some fee awards by a quality multiplier, ranging from 1.50 to 1.75, to reward those who exhibited "exceptional or extraordinary skill" in the litigation. 611 F.Supp. at 1328. The court declined, however, to apply an overall risk multiplier to the lodestar amount. Appeals have been taken from these rulings.

As noted, the PMC agreement required a trebled return of funds advanced off the top of any fees awarded by the court. Some PMC members therefore stood to receive enormously greater fees than they were awarded by the court, while others stood to receive substantially less. For example, David J. Dean, who was to have served as lead trial counsel and was awarded $1,424,283 in fees by the district court, would receive only $542,310 under the fee-sharing agreement. In contrast, Newton Schwartz, who was awarded only $41,886 by the district court, would receive $513,026 under the agreement.

Chief Judge Weinstein denied a motion by Dean to set aside the fee-sharing agreement after concluding that the agreement had no adverse impact on the interests of the class. *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1452, 1458–62 (E.D.N.Y.1985). However, he ordered that "[i]n future cases, *as soon as a*

*fee-sharing arrangement is made its existence must be made known to the court, and through the court to the class." Id.* at 1463. Dean has appealed from that ruling.

### 5) *Distribution of the Settlement*

A number of proposals for distribution of the settlement fund were presented to Chief Judge Weinstein. We focus on the plans submitted by the PMC, by Victor Yannacone, original lead counsel for the class, and by Special Master Feinberg.

The PMC proposed to compensate all class members who could prove that they suffered from any of 24 medical conditions that the PMC's experts associated with exposure to Agent Orange. These conditions included chloracne; peripheral and central neuropathy; various liver disorders, including cirrhosis, chronic hepatitis, and porphyria cutanea tarda; gastrointestinal conditions; hematological, endocrinal, and metabolic problems; benign and malignant tumors; birth defects; and miscarriages. The PMC proposal also suggested providing compensation to claimants with other medical problems, such as arthritis, heartburn, abdominal pain, and diarrhea, that "seem to have been reported in the literature as possibly accompanying Agent Orange exposure." The PMC would have adjusted each compensation award by a number of "individual discount factors" to reflect a claimant's financial needs and the legal and factual difficulties that the claimant would have encountered in proving his or her case in court. Accordingly, two claimants with similar medical conditions might have received different monetary awards depending, for example, on their collateral source payments, numbers of dependents, and ability to receive gratuitous services; the statutes of limitations and availability of a strict liability cause of action under the applicable state law; their levels of exposure to Agent Orange and/or dioxin, a factor the PMC has abandoned on appeal; their individual and family medical histories; "life style considerations"; and damages. The PMC suggested that the settlement fund might also be used to provide class-wide benefits such as "preventive and genetic counseling, health monitor-

ing, research and [group life and health] insurance."

The Yannacone proposal would have deferred any distribution of the settlement fund to individual claimants pending a survey of "who the Viet Nam veterans are, what their present state of health is, and how many have already died and from what causes." Yannacone urged that a portion of the settlement fund be used to establish a "Viet Nam Veterans Legal Assistance Foundation" to assist class members in obtaining disability benefits from the Veterans' Administration. Yannacone's proposal purported to speak for thousands of veterans and their families who "reaffirm[ed] their original position that the purpose of the *Agent Orange* litigation was to establish a trust fund for the benefit of all the *Agent Orange* victims not to benefit any individual veteran at the expense of their [sic] comrades-in-arms."

Special Master Feinberg proposed that the greater part of the settlement fund be distributed to individual veterans and family members in the form of death and disability benefits. The difficulties of establishing a causal link between a claimant's injuries and exposure to Agent Orange were to be avoided by compensating all claimants who had been exposed to the defoliant and who later died or became disabled as a result of non-traumatic causes. The Special Master proposed that the remainder of the settlement fund be used to provide services to the class as a whole and in particular to children with birth defects.

Chief Judge Weinstein conducted a public hearing on the various distribution plans on March 5, 1985. More than 40 speakers, including members of the PMC, Yannacone, representatives of veterans organizations, and individual class members, participated in the hearing. The PMC and other interested persons were allowed additional time following the hearing to submit written comments on the distribution proposals.

On May 28, 1985, Chief Judge Weinstein issued an order establishing a plan for distribution of the settlement fund. *In re*

*"Agent Orange" Product Liability Litigation ("Distribution Opinion"),* 611 F.Supp. 1396 (E.D.N.Y.1985). He adopted with slight modifications the Special Master's proposal, which he described as "an elegant solution [combining] insurance-type compensation to give as much help as possible to individuals who, in general, are most in need of assistance, together with a foundation run by veterans with the flexibility and discretion to take care of individuals and groups most in need of help." *Id.* at 1400. The plan provided that 75 percent of the $180 million settlement fund, including accrued interest, would be distributed directly "to exposed veterans who suffer from long-term total disabilities and to the surviving spouses or children of exposed veterans who have died." *Id.* at 1410–11. A claimant would qualify for compensation by establishing exposure to Agent Orange and death or disability not "predominantly caused by trauma, whether or not self-inflicted." *Id.* at 1412.

Chief Judge Weinstein offered four reasons for providing individual compensation payments only to disabled veterans and to survivors of deceased veterans. First, because the settlement fund was "not sufficient to satisfy the claimed losses of every class member," *id.* at 1411, it would be equitable to limit payments to those with the most severe injuries. Second, the payments would be made only to veterans or survivors, and not to children who had suffered birth defects and wives who had suffered miscarriages, because "however slight the suggestion of a causal connection between the veterans' medical problems and Agent Orange exposure, even less evidence supports the existence of an association between birth defects [or miscarriages] and exposure of the father to Agent Orange in Vietnam." *Id.* Third, claim processing costs would be minimized under the plan because claimants would not be required to prove that they suffered from any particular disease or that the disease was caused by exposure to Agent Orange; the court reasoned that any alternative eligibility criteria would require "[c]reation of a costly new claims-processing bureaucracy" and "impose on the applicant the enormous burdens of producing volumes of medical records and paying expensive medical and legal fees for complicated processing and testing." *Id.* Finally, the distribution plan " 'obviate[s] the necessity for particularized proof' and is 'a fair response to the particular difficulties that this class would have in gathering and presenting evidence of damages.' " *Id.* (quoting *In re Chicken Antitrust Litigation American Poultry,* 669 F.2d 228, 240 & n. 20 (5th Cir.1982)).

Chief Judge Weinstein rejected as "essentially arbitrary," *id.* at 1409, the PMC's plan to provide compensation only for specified diseases. He reasoned that "[n]o factual basis exists for choosing or excluding any disease, since causation cannot be shown for either individual claimants or individual diseases with any appropriate degree of probability." *Id.* In addition, he concluded that the costs of establishing the existence of particular diseases and applying individual discount factors would be burdensome and expensive for both the fund and the claimant. *Id.* at 1408–09.

Chief Judge Weinstein set aside most of the remainder of the settlement fund to support a "class assistance foundation" that would "serve as a national focus for Vietnam veterans who are class members to mobilize themselves and others to deal with their medical and related problems." *Id.* at 1432. The "broad mandates" of the foundation were defined as "to fund projects to aid children with birth defects and their families and alleviate reproductive problems" and "to fund projects to help meet the service needs of the class as a whole." *Id.* at 1437. The district judge reasoned that the foundation was "[t]he most practicable and equitable method of distributing benefits" to class members who were neither disabled veterans nor survivors of deceased veterans, because "[d]istribution of thousands of small individual payments would trivialize the beneficial impact of the settlement fund on the needs of the class." *Id.* at 1431.

The court offered a number of examples of the sorts of programs for which the foundation might provide financial support.

The projects that might be funded for children with birth defects included "[p]rotection and advocacy services," "[a] public hotline and referral service," "[g]rants to hospitals and clinics," "insurance programs," "vocational training projects," "grants to establish peer support groups to enable children with birth defects to discuss their problems openly among themselves," and "[g]rants or loans ... to families in grave financial need to help pay for essential medical services." *Id.* at 1438–39. Other possibilities "for funding of class-wide services" enumerated by the court included projects to "help class member veterans better obtain and utilize VA services and to monitor the VA and other federal and state services to ensure that they are responsive to the needs of the class," to "increase public awareness of the problems of the class," to provide health information and social service assistance to the class, and to "help members of the class become a more integrated part of society." *Id.* at 1440.

The foundation was to be administered by a board of directors "comprised primarily of Vietnam veterans." *Id.* at 1434. The court would appoint the initial board of directors of between 15 and 45 members, which would thereafter be "self-governing and self-perpetuating." *Id.* at 1435. Subject only to the general supervisory authority retained by the court, the board would control "every aspect of foundation administration," including "investment and budget decisions, specific funding priorities, a detailed grant application process, the actual grant awards, evaluation mechanisms, and fundraising strategies." *Id.* The court would play "[a] comparatively modest supervisory role in the operation of the class assistance foundation," while retaining the power to "supervise foundation operations actively and exercise control as necessary to protect the interests of the class." *Id.* at 1436.

Chief Judge Weinstein reappointed Special Master Feinberg to oversee the implementation of the distribution plan. *Id.* at 1400. However, no claimants were to receive payments and no services were to be funded until the appellate process was completed. *Id.* at 1451.

The PMC filed an appeal and petition for a writ of mandamus/prohibition on August 19, 1986, seeking to overturn the distribution plan. On September 5, 1986, Mr. Yannacone filed a petition for a writ of mandamus/prohibition seeking removal of the PMC as class counsel and implementation of his proposed distribution plan.

### 6) *Dismissal of the Opt-Out Cases*

After settling with the class, defendants moved on July 24, 1984, for summary judgment against the opt-outs. Chief Judge Weinstein dismissed the opt-outs on the grounds that, *inter alia*, no plaintiff was able as a matter of law to produce sufficient evidence to allow a trier of fact to find that Agent Orange had caused the particular ailment(s) from which he or she suffered. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1256–63 (E.D.N.Y.1985) (*"Opt-Out Opinion"*). As a second, independently dispositive ground, Chief Judge Weinstein held that the military contractor defense precluded recovery. *Id.* at 1263–64. Certain opt-out plaintiffs appeal from those decisions.

### 7) *Proceedings Against the Government and Miscellaneous Actions*

The first direct claim against the United States was asserted by veterans who believed that they had been exposed to Agent Orange. *Ryan v. Cleland*, 531 F.Supp. 724 (E.D.N.Y.1982). The plaintiffs alleged that the government and certain government officials were liable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) *et seq.*, for failing to warn them of the possible dangers associated with exposure to Agent Orange and neglecting to provide proper medical care for those who had been injured by the herbicide. Judge Pratt held that the United States was immune from suit under the FTCA on the failure-to-warn claims because those claims were "incident to and arising out of" the plaintiffs' military service and therefore fell within the exception to the government's waiver of

sovereign immunity recognized in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and its progeny. 531 F.Supp. at 728. The remainder of the complaint was dismissed on various jurisdictional grounds that are not challenged on appeal.

The government refused to participate in the negotiations that culminated in the settlement of the class action. *See Settlement Opinion,* 597 F.Supp. at 879 (letter from government counsel to court). In the settlement agreement, the plaintiff class and the defendant chemical manufacturers "expressly reserve[d] all rights and claims which they now have, or may at any time be entitled to assert against the United States, including its offices, departments, agencies, representatives, agents and employees." Settlement Agreement ¶ 11, *id.* at 865. Veterans and their families renewed their efforts to obtain relief from the government following the settlement. In July 1984, an Eighth Amended Complaint was filed on behalf of a number of named plaintiffs (the "Aguiar plaintiffs") and a proposed plaintiff class composed of veterans who claimed injury from exposure to Agent Orange and their spouses, parents, and children. In an attempt to circumvent the *Feres* doctrine, the complaint alleged that the government and certain government officials had engaged in negligent and intentionally tortious conduct that occurred before, during, and after the veterans' military service.

Chief Judge Weinstein refused to certify the plaintiffs' claims against the government as a class action, reasoning that "the enormous expenditure required to notify potential class members is not justified given the almost nonexistent possibility of recovery against the government on the merits." *In re "Agent Orange" Product Liability Litigation,* 603 F.Supp. 239, 242 (E.D.N.Y.1985). In addition, he stated that

class certification would unfairly preclude children with birth defects from bringing suit were future scientific studies to establish the validity of their claims against the government. *Id.* Chief Judge Weinstein then dismissed all claims against the government by veterans, as well as all derivative claims by veterans' spouses and children on such theories as loss of earnings and services. Agreeing with Judge Pratt that the United States was immune from suit on such claims under *Feres,* he rejected the plaintiffs' efforts to circumvent the *Feres* doctrine. *Id.* at 243–45. An appeal has been taken from that ruling.

Chief Judge Weinstein also concluded that the veterans' wives and children had produced "no evidence of any probative value" demonstrating that their miscarriages and birth defects were caused by Agent Orange or refuting "the government's overwhelming showing of no present proof of causation." *Id.* at 247. He therefore granted summary judgment to the government with respect to the wives' "direct" claims for independent injuries. However, he dismissed the children's direct claims without prejudice, reasoning that "discretion should generally be exercised in favor of an infant who lacks evidence to support his or her claim but who may obtain such evidence in the future." *Id.* at 247.[2]

In a related action, two former civilian employees of the University of Hawaii and the widow of a third brought suit against the United States, the manufacturers of Agent Orange, and the former Regents of the University for injuries allegedly sustained during Agent Orange experiments at the University in 1967. *In re "Agent Orange" Product Liability Litigation (Fraticelli v. Dow Chemical Co.),* 611 F.Supp. 1285 (E.D.N.Y.1985). Chief Judge Weinstein denied certification of a proposed plaintiff class consisting of 35,000 unnamed residents of Kauai County, Ha-

---

2. A complaint essentially equivalent to the Eighth Amended Complaint was subsequently filed on behalf of a second group of plaintiffs (the "Adams plaintiffs") in the Southern District of Texas and transferred to the Eastern District of New York. On June 19, 1986, Chief Judge Weinstein disposed of this action in the same manner as he had disposed of the earlier action against the government. The dismissal of the veterans' claims has been appealed in both actions; however, the summary judgment on the wives' direct claims has been appealed only in the later action.

waii. He reasoned that the named plaintiffs had failed to demonstrate that they shared a common interest with the remainder of the proposed class. *Id.* at 1288. Chief Judge Weinstein then disposed of the individual plaintiffs' claims against each of the defendants. He dismissed the claims against the chemical manufacturers and the former Regents, with the exception of the widow's wrongful death claim, as barred by Hawaii's two-year statute of limitations for personal injury actions. *Id.* at 1288–89. He also dismissed the claims against the former Regents on the ground that Hawaii's workers' compensation statute provides the exclusive remedy against an employer for work-related injuries. *Id.* at 1289. Finally, he granted summary judgment in favor of all defendants, having found "no admissible evidence that Agent Orange caused plaintiffs' illnesses." *Id.* An appeal has been taken.

The defendant chemical manufacturers served third-party complaints against the government for indemnification or contribution in January 1980. Judge Pratt dismissed the third-party complaints in their entirety on the basis of *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), which bars a defendant from obtaining indemnification or contribution from the government for damages paid to a serviceman-plaintiff in circumstances where the serviceman would be barred by *Feres* from suing the government directly for his injuries. *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980). However, no formal order of dismissal was entered.

Chief Judge Weinstein reconsidered the dismissal of the third-party complaints after he took charge of the Agent Orange litigation. *See In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242 (E.D.N.Y.), *mandamus denied,* 733 F.2d 10 (2d Cir.), *appeal dismissed,* 745 F.2d 161 (2d Cir.1984). Analyzing the three rationales for the *Feres* doctrine, Chief Judge Weinstein held that it barred suit against the government only with respect to the claims of the veterans and the derivative claims of their families. 580

F.Supp. at 1247. He therefore reinstated the defendants' third-party complaints against the government as to the direct claims of the veterans' wives and children for their own injuries on the ground that such claims were precluded by neither *Feres-Stencel* nor by any of the statutory exceptions to government liability contained in the FTCA. *Id.* at 1247–56. Chief Judge Weinstein later granted summary judgment to the government on the outstanding third-party claims. *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1221 (E.D.N.Y.1985). Reasoning that the FTCA precludes recovery against the United States "[i]n the absence of some form of [governmental] misfeasance," he found no such misfeasance in the instant case. *Id.* at 1223. He thus rejected the defendants' claim that the government had withheld information about Agent Orange from them in the mid–1960s, finding that the defendants and the government had "essentially the same knowledge about possible dangers from dioxin in Agent Orange." *Id.* An appeal has been taken.

## III. CLASS MEMBERS' OBJECTIONS TO THE SETTLEMENT

We now address the various objections to the maintenance and settlement of the class action made by some class members.

### 1) *Subject Matter Jurisdiction*

The third amended complaint alleged that its class action claims were governed, *inter alia,* by "federal common law" and that the district court therefore had federal question jurisdiction. Judge Pratt agreed. *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 737, 749 (E.D.N.Y. 1979). We reversed, *In re "Agent Orange" Product Liability Litigation,* 635 F.2d 987 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), and the class action was thereafter maintained solely on the basis of diversity jurisdiction. Appellants, members of the plaintiff class, now contend that a diversity class action cannot be brought in federal court absent complete diversity of citizen-

ship between all class members and all defendants. It goes without saying that such complete diversity is lacking in this case.

█ Although we understand the need to preserve issues for further review, we confess a certain surprise at the vigor with which this argument was pressed in this court and the amount of time that was devoted to it at oral argument. It is hornbook law, based on 66 years of Supreme Court precedent, that complete diversity is required only between the named plaintiffs and the named defendants in a federal class action. 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3606, at 424 (2d ed. 1986) ("[t]he courts look only to the citizenship of the representative parties in a class action"). As the Supreme Court noted in *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969):

> Under current doctrine, if one member of a class is of diverse citizenship from the class' opponent, and no nondiverse members are named parties, the suit may be brought in federal court even though all other members of the class are citizens of the same State as the defendant and have nothing to fear from trying the lawsuit in the courts of their own State. See *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356 [41 S.Ct. 338, 65 L.Ed. 673] (1921).

394 U.S. at 340, 89 S.Ct. at 1059. *See also United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1129 (2d Cir.1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975). Thus, if appellants' theory of class action jurisdiction is to become law, this must be done by the Supreme Court.

Appellants also argue that even if *Snyder v. Harris* is good law, three of the named plaintiffs were co-citizens of three of the defendants. They contend that: (1) named plaintiff Michael F. Ryan and defendant Hooker Chemical were citizens of New York; (2) named plaintiff Brian T. Quinn and defendant Riverdale Chemical were citizens of Illinois; and (3) named plaintiff Dan G. Jordan and defendant Diamond Shamrock were citizens of Texas.

Both Hooker Chemical and Riverdale Chemical effectively ceased to be parties to the case before the filing of the final amended class complaint against the Agent Orange manufacturers. Hooker was granted summary judgment in February 1982, on the ground that it did not manufacture Agent Orange. *In re "Agent Orange" Product Liability Litigation*, 534 F.Supp. 1046, 1052 (E.D.N.Y.1982). Riverdale's unopposed motion for summary judgment was granted in May 1983. *See In re "Agent Orange" Product Liability Litigation*, 565 F.Supp. 1263, 1272 (E.D.N.Y.1983).

█ Appellants argue that because no Rule 54(b) [3] certification of dismissal was issued as to either Hooker or Riverdale, both defendants remain in the case for purposes of determining diversity jurisdiction. We believe that their view misconstrues Rule 54(b). The Supreme Court has noted that the "obvious purpose" of Rule 54(b) is to provide "an opportunity for litigants to obtain from the District Court a clear statement of what that court is intending with reference to finality, and if such a direction is denied, the litigant can at least protect himself accordingly." *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 512, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950). Because the purpose of the rule is thus only to clarify the appeala-

---

**3.** Fed.R.Civ.P. 54(b) provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

bility of an order, a dismissed defendant who fails to obtain a Rule 54(b) certification does not remain a party to the case for purposes of determining diversity.

■ Appellants' allegation regarding the citizenship of Diamond Shamrock is equally meritless. At the time the action was initiated against Diamond Shamrock, its principal place of business was in Ohio. The fact that it has since moved to Texas, the domicile of named plaintiff Dan Jordan, is irrelevant for diversity purposes. *See Smith v. Sperling*, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957) ("jurisdiction, once attached, is not impaired by a party's later change of domicile"). Thus, all of appellants' claims that diversity of citizenship is lacking are without merit.

■ Finally, appellants contend that the district court lacked jurisdiction over the class action because not all members of the class met the $10,000 jurisdictional requirement. *See Zahn v. International Paper Co.*, 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973) ("[e]ach plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case"). However, "unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (footnotes omitted). Appellants do not argue that any class members made bad faith damage claims. Nor do they offer us any basis for determining whether such claims clearly are for less than the jurisdictional amount. Instead, they claim the district court failed to carry out an obligation to police the damage claims. No such affirmative obligation exists, however, absent some apparent reason to make inquiry. Plaintiffs made what must be assumed to have been good faith allegations that each of them was entitled to at least $10,000 in damages. Defendants did not challenge the *bona fides* of these claims, and the district court thus had no reason to inquire further.

### 2) *In Personam Jurisdiction*

■ Appellants contend that the district court was barred by the due process clause of the fifth amendment from exercising personal jurisdiction over class members who lack sufficient contacts with New York as defined in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. However, appellants concede, as they must, that Congress may, consistent with the due process clause, enact legislation authorizing the federal courts to exercise nationwide personal jurisdiction. *See Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 442, 66 S.Ct. 242, 245, 90 L.Ed. 185 (1946) ("Congress could provide for service of process anywhere in the United States"). One such piece of legislation is 28 U.S.C. § 1407 (1982), the multidistrict litigation statute. In the instant case, the district court was acting pursuant to a valid transfer order of the Judicial Panel on Multidistrict Litigation that was created by that statute. As the Panel has recognized,

> Transfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue.... Following a transfer, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer.

*In re FMC Corp. Patent Litigation*, 422 F.Supp. 1163, 1165 (J.P.M.D.L.1976) (citations omitted). *See also In re Sugar Industry Antitrust Litigation*, 399 F.Supp. 1397, 1400 (J.P.M.D.L.1975) (rejecting due process challenge similar to that raised by appellants in the instant case). Appellants' argument therefore fails.

### 3) *Class Certification*

Appellants argue that the district court erred in certifying the Rule 23(b)(3) class action. They make the same arguments made by the defendants in petitioning for a writ of mandamus seeking decertification

of the class action. *See In re Diamond Shamrock Chemicals Co.*, 725 F.2d 858 (2d Cir.), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). In denying the mandamus petition, we expressed doubt as to the existence of any issue of fact, let alone a common issue, regarding "general causation." *See* 725 F.2d at 860. We also stated, however, that "it seems likely that some common issues, which stem from the unique fact that the alleged damage was caused by a product sold by private manufacturers under contract to the government for use in a war, can be disposed of in a single trial. The resolution of some of these issues in defendants' favor may end the litigation entirely." *Id.* at 860–61. Therefore, we denied the petition. We stressed, however, that our scope of review in the mandamus proceeding was limited to the redress of a calculated disregard of governing rules, *id.* at 860, not the correction of ordinary error, and that the propriety of a class certification might be fully reviewed on a later appeal. *Id.* at 862. This is that appeal.

Rule 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Existence of the first prerequisite in this case is undisputed. Whether there are problems regarding typicality and adequacy of representation depends upon the nature of the questions of law or fact common to the class. Our view of the existence of the third and fourth prerequisites is thus influenced by our view of the second.

We must also look to the requirements of Rule 23(b)(3) that:

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The comment to Rule 23(b)(3) explicitly cautions against use of the class action device in mass tort cases. *See* Advisory Committee Note to 1966 Revision of Rule 23(b)(3) ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways."). Moreover, most courts have denied certification in those circumstances. *See, e.g., In re Northern Dist. of Cal. Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *Payton v. Abbott Labs.*, 100 F.R.D. 336 (D.Mass.1983); *Yandle v. PPG Industries, Inc.*, 65 F.R.D. 566 (E.D.Tex.1974); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 83–85 (M.D.Pa.), *appeal dismissed*, 505 F.2d 729 (3d Cir.1974).

■ The present litigation justifies the prevalent skepticism over the usefulness of class actions in so-called mass tort cases and, in particular, claims for injuries resulting from toxic exposure. First, the benefits of a class action have been greatly exaggerated by its proponents in the present matter. For example, much ink has been spilled in this case over the distinction between generic causation—whether Agent Orange is harmful at all, regardless of the degree or nature of exposure, and what ailments it may cause—and individual causation—whether a particular veteran suffers from a particular ailment as a result of exposure to Agent Orange. It has been claimed that the former is an issue that might appropriately be tried in a class action, notwithstanding that individual causation must be tried separately for each plaintiff if the plaintiff class prevails.

We do not agree. The generic causation issue has three possible outcomes: 1) exposure to Agent Orange always causes harm; 2) exposure to Agent Orange never causes harm; and 3) exposure to Agent Orange

may or may not cause harm depending on the kind of exposure and perhaps on other factors. It is indisputable that exposure to Agent Orange does not automatically cause harm. The so-called Ranch Hand Study of Air Force personnel who handled and sprayed the herbicide proved that much beyond a shadow of a doubt in finding no statistically significant differences between their subsequent health histories and those of similar personnel who had not been in contact with Agent Orange. Further, defendants have conceded that some kinds of exposure to Agent Orange *may* cause harm. They stated at both the argument of the mandamus petition and the argument of the appeal that Agent Orange, like anything else, including water and peanuts, may be harmful. The epidemiological studies on which defendants rely so heavily prove no more than that Vietnam veterans do not exhibit statistically significant differences in various symptoms when compared with other groups. They in no way exclude the possibility of injury, and tend at best to prove only that, if Agent Orange did cause harm, it was in isolated instances or in cases of unusual exposure.

The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (*e.g.* state of health, lifestyle) and the nature of their exposure to Agent Orange. Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

The second reason for our skepticism is that, with the exception of the military contractor defense, there may be few, if any, common questions of law. Although state law governs the claims of the individual veterans, *see In re "Agent Orange" Product Liability Litigation*, 635 F.2d at 993–95 (rejecting cause of action under federal common law), Chief Judge Weinstein

decided that there were common questions of law because he predicted that each court faced with an Agent Orange case would resort to a national consensus of product liability law. Chief Judge Weinstein's analysis of the choice of law issues in this action, *see In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 690 (E.D. N.Y.1984), with which we assume familiarity, is bold and imaginative. However, in light of our prior holding that federal common law does not govern plaintiffs' claims, every jurisdiction would be free to render its own choice of law decision, and common experience suggests that the intellectual power of Chief Judge Weinstein's analysis alone would not be enough to prevent widespread disagreement.

Third, the dynamics of a class action in a case such as this may either impair the ability of representative parties to protect the interests of the class or cause the inefficient use of judicial resources. These undesirable results stem from the fact that potential plaintiffs in toxic tort cases do not share common interests because of differences in the strength of their claims. Before the class is certified, it is usually some of the plaintiffs who seek certification and defendants who resist. This is so because many of the plaintiffs' counsel will perceive in a class action efficiencies in discovery, legal and scientific research, and the funding of expenses. When counsel can reasonably expect to become counsel for the class and to share in a substantial award of fees, the incentive to seek certification is greatly enhanced. Defendants will resist certification, hoping to defeat the plaintiffs individually through application of their greater resources.

All plaintiffs may not desire class certification, however, because those with strong cases may well be better off going it alone. The drum-beating that accompanies a well-publicized class action claiming harm from toxic exposure and the speculative nature of the exposure issue may well attract excessive numbers of plaintiffs with weak to fanciful cases. For example, notwithstanding the grave doubt surrounding the factual basis of the plaintiffs' case, some 240,-

000 veterans and family members alleging hundreds of different ailments, including many that are both minor and commonplace, have filed claims for payment out of the settlement fund.

If plaintiffs with strong claims remain members of the class, they may see their claims diluted because a settlement attractive to the defendants will in all likelihood occur. Weak plaintiffs, who may exist in very large numbers, stand to gain from even a small settlement. Moreover, once a significant amount of money is on the table, the class attorneys will have an incentive to settle. They may well anticipate that the percentage of this money likely to be awarded as counsel fees will decline after a certain point. If they go to trial, on the other hand, they run the risk of losing the case and receiving no compensation for what may have been an enormous amount of work. There is thus great pressure to settle. Indeed, a settlement in a case such as the instant litigation, dramatically arrived at just before dawn on the day of trial after sleepless hours of bargaining, seems almost as inevitable as the sunrise. Such a settlement, however, is not likely to lead to a fund that can be distributed among the large number of class members who will assert claims and still compensate the strong plaintiffs for the value of their cases.

Moreover, the ability of the district court to scrutinize the fairness of the settlement is greatly impaired where the legal and factual issues to be determined in the class action are as numerous and complex as they were under the district court's order in the instant case. Similarly, the fashioning of a distribution plan that is both fair to the strong plaintiffs and efficient in adjudicating the large number of claims may be impossible. Only the weakness of the evidence of causation as to all plaintiffs and the strength of the military contractor defense enabled the district court to evaluate the settlement accurately and to fashion an appropriate distribution scheme in the instant matter. We regard those factors as largely coincidental and not to be expected in all toxic exposure cases.

If the strong plaintiffs opt out, however, the efficiencies of a class action may be negative. The class would then consist largely of plaintiffs with weak cases, many or most of which should never have been brought. The defendants would be unlikely to settle with the class because such a settlement with the class would not affect their continuing exposure to large damage awards in the individual cases brought by strong plaintiffs. Both the class action and the strong cases would then have to be tried.

■ Were this an action by civilians based on exposure to dioxin in the course of civilian affairs, we believe certification of a class action would have been error. However, we return to the cardinal fact we noted in denying the petition for writ of mandamus, namely that "the alleged damage was caused by a product sold by private manufacturers under contract to the government for use in a war." *In re Diamond Shamrock Chemicals Co.,* 725 F.2d at 860. In that regard, Chief Judge Weinstein noted that:

> Unlike litigations such as those involving DES, Dalkon Shield and asbestos, the trial is likely to emphasize critical common defenses applicable to the plaintiffs' class as a whole. They will include such matters as ... that if any injuries were caused by defendants' product it was because of the particular use and misuse made by the government; and that the government, not the manufacturers were wholly responsible because the former knew of all possible dangers and assumed full responsibility for any damage.... It is anticipated that a very substantial portion of a prospective four-month trial will be devoted to just those defenses. Certification would be justified if only to prevent relitigating those defenses over and over again in individual cases.

*Class Certification Opinion,* 100 F.R.D. at 723.

In our view, class certification was justified under Rule 23(b)(3) due to the centrality of the military contractor defense. First, this defense is common to all of the

plaintiffs' cases, and thus satisfies the commonality requirement of Rule 23(a)(2). *See Port Authority Police Benevolent Ass'n v. Port Authority of New York & New Jersey,* 698 F.2d 150, 154 (2d Cir.1983) ("Since plaintiff has satisfied the requirement of *a common question* of law or fact, Rule 23(a)(2), the denial of class certification must be reversed.") (emphasis added). Second, because the military contractor defense is of central importance in the instant matter for reasons explained in our subsequent discussion of the fairness of the settlement and in our separate opinion affirming the grant of summary judgment against the opt-outs, this issue is governed by federal law, and a class trial in a federal court is a method of adjudication superior to the alternatives. Fed R.Civ.P. 23(b)(3). If the defense succeeds, the entire litigation is disposed of. If it fails, it will not be an issue in the subsequent individual trials. In that event, moreover, the ground for its rejection, such as a failure to warn the government of a known hazard, might well be dispositive of relevant factual issues in those trials.

Appellants argue that the diverse interests of the class make adequate representation virtually impossible. We disagree. If defendants had successfully interposed the military contractor defense, they would have precluded recovery by all plaintiffs, irrespective of the strengths, weaknesses, or idiosyncrasies of their claims. Similarly, the typicality issue disappears because of the virtual identity of all of the plaintiffs' cases with respect to the military contractor defense.

It is true that some of the dynamics that generate pressure for an undesirable settlement will continue to operate in a class action limited to the military contractor defense. We believe, however, that a district court's ability to scrutinize the fairness of a class settlement is greatly enhanced by narrowing the legal and factual issues to this defense. We are confident, moreover, that such scrutiny will be informed by the court's awareness of the danger of such a settlement occurring. It is also true that the difficulty in fashioning a distribution scheme that does not overcompensate weak claimants and undercompensate strong ones is not alleviated by limiting the class certification to the military contractor defense. However, on balance we believe use of the class action was appropriate, although many potential difficulties were avoided only because all plaintiffs had very weak cases on causation and the military contractor defense was so strong.

We thus conclude that certification of the Rule 23(b)(3) class action was proper. Because our disposition of the appeals from the approval of the settlement and from the grant of summary judgment against the opt-outs excludes any possibility of an award of punitive damages, we need not address the propriety of the certification of a mandatory class under Rule 23(b)(1)(B).

## 4) *Adequacy of the Notice of the Class Action*

In addressing the defendants' petition for a writ of mandamus, we noted only that Chief Judge Weinstein's conclusion that the notice ordered was the best practicable under the circumstances was "if not inexorable, … arguably correct, at least before the full results [of the notice plan] are known." *In re Diamond Shamrock Chemicals Co.,* 725 F.2d at 862. Full review is now necessary.

Appellants argue that both the notice required by the district court, *see Class Certification Opinion,* 100 F.R.D. at 729–34, and the notice actually given were insufficient to inform the class members of their rights, most importantly their right to opt out. They contend therefore that the notice failed to meet the requirements of due process and Rule 23(c)(2) and seek an additional notification period as well as an additional opt-out period.

The portion of the order that dealt with notice, set out in full in the appendix, adopted a creative approach appropriate to this unique case. It required that letter notice be sent to the 92,275 veterans listed in the Agent Orange Registry established by the Veterans' Administration in 1978 to identify potential victims as well as to the 11,256 persons who had filed or intervened

in lawsuits or had counsel affiliated with the PMC. The court concluded that these were the only class members who could be identified and located through reasonable effort. *Id.* at 729–31. The court also required various forms of substitute notice, including announcements in various servicepersons' and national publications and on radio and television. In addition, the court directed that a letter be sent to every governor requesting that notice of the lawsuit be provided to any state agencies that might have lists of veterans.

Rule 23, of course, accords considerable discretion to a district court in fashioning notice to a class, *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S.Ct. 2326, 2334, 60 L.Ed.2d 931 (1979), and our standard of review is "the familiar one of whether the District Court was 'clearly erroneous' in its factual findings and whether it 'abused' its traditional discretion." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2374–75, 45 L.Ed.2d 280 (1975) (discussing "abuse of discretion" standard in award of back pay under Title VII of Civil Rights Act of 1964). *See generally Anderson v. Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) (elaborating on "clearly erroneous" standard).

Rule 23(c)(2) requires only that members of a Rule 23(b)(3) class be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Relying principally upon *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), appellants nonetheless contend that actual notice to each and every class member was essential. We disagree.

In *Mullane,* the Supreme Court held that notice by publication of pending settlements of accounts was constitutionally sufficient as to trust beneficiaries whose names and addresses were unknown to the

trustee. Noting the state's interest "in bringing any issues as to its fiduciaries to a final settlement," *id.* at 313, 70 S.Ct. at 657, and the beneficiary's interest in being apprised of the pendency of settlements in order to "choose for himself whether to appear or default, acquiesce or contest," *id.* at 314, 70 S.Ct. at 657, the Court concluded that notice by publication was permissible as to persons whose whereabouts or interests could not be determined through due diligence or whose interests were either conjectural or future. *Id.* at 317–18, 70 S.Ct. at 658–59. It noted that where the performance of a trustee was the issue, the interests of unknown beneficiaries were likely to be protected by the known and notified beneficiaries, who had to be provided with mailed notice. The Court stated:

> This type of trust presupposes a large number of small interests. The individual interest does not stand alone but is identical with that of a class. The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objection sustained would inure to the benefit of all. We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable.

*Id.* at 319, 70 S.Ct. at 359. Appellants contend that, unlike *Mullane,* the interests of Agent Orange class members who were unaware of the instant litigation would not be protected by those class members who did receive notice.[4]

It is true that the claims of the plaintiffs are highly individualistic in a number of respects. The interests of all of the plaintiffs are identical, however, with regard to the facts and the law relevant to the military contractor defense. The class mem-

---

**4.** The PMC challenges appellants' standing to challenge any aspect of the settlement other than its substantive fairness. Master Brief of Appellee Plaintiffs' Management Committee at 66–67. It argues that appellants seek not to advance their own interests, but rather those of,

for example, class members who did not receive notice. Due to our disposition of appellants' claims, we are not compelled to address this objection to standing and therefore do not do so.

bers with actual notice therefore would have represented the interests of the class members unaware of the action.

■ Moreover, Chief Judge Weinstein found that many of the members of the class were unknown and could not be located through reasonable efforts. That conclusion is a finding of fact, and must be accepted unless clearly erroneous. *In re Franklin National Bank Securities Litigation,* 599 F.2d 1109, 1110–11 (2d Cir. 1979). We cannot agree with appellants that all 2.4 million Vietnam veterans should have been sent letter notice. First, it is undisputed that far fewer than that number were exposed to Agent Orange. A requirement that notice be given to all Vietnam veterans would thus have been considerably overbroad. Second, there is no assurance that such a list could have been compiled through reasonable efforts. Appellants claim that some records kept by the government would have facilitated individualized notice. They concede, however, that there was no easily accessible list of veterans, as there must have been of royalty holders in *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), and of odd-lot trading customers in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). We cannot find, therefore, that such a comprehensive list could reasonably have been compiled.

■ We also note that the second phase of the plan enlisted the aid of the mass media and state governments, an effort that ultimately resulted in letter notice to 20,000 class members in addition to the more than 100,000 given notice in the first phase of the plan. We also take judicial notice of the widespread publicity this litigation has received. Given the great doubt as to whether anyone at all was injured by Agent Orange, the fact that some 240,000 claims have been filed suggests that no practical problem exists as to the adequacy of the notice.

■ Appellants offer no feasible alternative to the notice plan adopted by the district court for identifying and contacting persons actually exposed to Agent Orange.

In this regard, we are informed by the statement of our late colleague Judge Friendly that it is inappropriate to second-guess a district court's class notice procedure, "particularly [where] no alternative method of ascertaining class members' identities has been suggested to us." *Weinberger v. Kendrick,* 698 F.2d 61, 71 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In sum, the notice plan adopted by Chief Judge Weinstein was fully adequate under the circumstances.

■ Appellants also raise numerous objections to the content of the notice given. They contend, for example, that there were discrepancies among the various notices as to whether the class consisted of persons who "claim injury," "were injured," or "can claim injury" from Agent Orange. Such objections provide no basis for us to require the sending of new notice, however, because the essential goal of the notice requirement would have been accomplished by any of the above formulations. Anyone who believed that he or she had suffered injury as a result of exposure to Agent Orange in Vietnam was on notice of the pendency of a lawsuit and was thus alerted to seek advice from counsel.

■ Finally, appellants point out that a large number of mailed notices were returned undelivered. In litigation of this sort, such returns must be regarded as inevitable. They also note the alleged failure of class counsel to ensure that all of the publication and broadcast notices were provided in a timely fashion. These omissions occurred in part because of a clerical misunderstanding regarding a stay we granted after denial of the defendants' mandamus petition. *See Settlement Opinion,* 597 F.Supp. at 756. Moreover, a major effort was made to disseminate notice through the media, and we are convinced that the omissions noted were of little consequence in light of the actual notice and widespread publicity.

5) *Adequacy of Post-Settlement Procedures*

■ Appellants argue that Chief Judge Weinstein should have conducted hearings

to evaluate the adequacy of the settlement prior to ordering notice of the settlement to the class. We have previously noted in addressing a similar argument that "[t]he question becomes whether or not the District Court had before it sufficient facts intelligently to approve the settlement offer. If it did, then there is no reason to hold an additional hearing on the settlement or to give appellants authority to renew discovery." *Grinnell I,* 495 F.2d at 462–63. Although appellants have stated in attacking the settlement that Chief Judge Weinstein was *too* involved in its negotiation, they argue here that he did not know enough about the settlement to assess its reasonableness. Their argument is totally frivolous. Chief Judge Weinstein was thoroughly informed of the strengths and weaknesses of the parties' positions. No hearing was necessary, therefore.

■ Appellants also challenge the validity of the notice of settlement sent to class members. They allege, *inter alia,* that the notice was defective because it failed to detail a distribution plan. There is, however, no absolute requirement that such a plan be formulated prior to notification of the class. *See In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 223–24 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case. This can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement. The formulation of the plan in a case such as this is a difficult, time-consuming process. To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished. Moreover, if a hearing on a settlement must follow formulation of a distribution plan, then reversal of any sig-

nificant aspect of the plan on appeal, as has occurred in the instant case with regard to the establishment of a foundation, would require a remand for reconsideration of the settlement, followed by yet another appeal. There is no sound reason to impose such procedural straitjackets upon the settlements of class actions. Finally, we note that Chief Judge Weinstein's approval of the settlement was subject to formulation of and hearings on a plan for distribution.

### 6) *Adequacy of the Settlement*

As required by Fed.R.Civ.P. 23(e), Chief Judge Weinstein carefully reviewed the proposed settlement, and gave his approval subject to hearings on attorneys' fees and approval of a settlement fund distribution plan. *See Settlement Opinion,* 597 F.Supp. 740 (E.D.N.Y.1984). He stated:

> The court has been deeply moved by its contact with members of the plaintiffs' class from all over the nation and abroad. Many do deserve better of their country. Had this court the power to rectify past wrongs—actual or perceived—it would do so. But no single litigation can lift all of plaintiffs' burdens. The legislative and executive branches of government—state and federal—and the Veterans Administration, as well as our many private and quasi-public medical and social agencies, are far more capable than this court of shaping the larger remedies and emotional compensation plaintiffs seek.
>
> Within the sharply limited judicial role we must ask whether the settlement of the litigation proposed by the parties' representatives is acceptable. For the reasons indicated below we tentatively hold that it is. It gives the class more than it would likely achieve by attempting to litigate to the death. It provides funds to help at least some men, women and children whose hardships will be reduced in some small degree. It does represent a major step in the essential process of reconciliation among ourselves.

*Id.* at 747.

Our role in scrutinizing the approval of the settlement is limited in light of the

district court's extensive knowledge of the parties and their respective cases. As we stated in *Grinnell I,* "so much respect is accorded the opinion of the trial court in these matters that this court will intervene in a judicially approved settlement only when objectors to that settlement have made a clear showing that the District Court has abused its discretion." 495 F.2d at 455 (citations omitted). We also noted that "[t]he proposed settlement cannot be judged without reference to the strength of plaintiffs' claims," and that "[i]f the settlement offer was grossly inadequate ... it can be inadequate only in light of the strength of the case presented by the plaintiffs." *Id.*

Appellants argue that the $180 million settlement approved by the district court is woefully inadequate. They contend that the PMC underestimated the strength of the class' case, the total number of claimants, the number with serious claims, and the value of these claims had they been presented to juries. They assert that the principal PMC negotiator estimated that there were only about 20,000 claims, 3,000 of which were serious in nature. Appellants' own estimate is that there are at least 20,000 serious claims, each worth at least $500,000. Appellants seek to bolster their position by noting that 240,000 veterans have filed claims against the settlement fund.

We view the lack of hard information as to the number of "serious" claims—apparently a reference to the amount of damage suffered since no individual Agent Orange claim is strong on liability—as a sign of the weakness of the plaintiffs' case. Those who challenge the settlement, including counsel who have been involved in the litigation for many years, continue merely to speculate about the number of serious claims. That fact supports rather than undermines the settlement.

We are also unimpressed by the use of the total number of claimants as a means of attacking the settlement. The 240,000 claimants specify hundreds of different ailments, some of which, such as anxiety or fatigue, are so common that causation by Agent Orange simply cannot be proved. Moreover, the existence of such a large number of claimants proves nothing. For example, thousands of birth defects in the children of Vietnam veterans exposed to Agent Orange would not statistically differentiate that group from the population generally. *See Settlement Opinion,* 597 F.Supp. at 789 (quoting JAMA editorial by Bruce B. Dan, M.D.). The irrelevance of the number of claimants results from the fact that every Vietnam veteran who might have been exposed to Agent Orange was invited to file a claim regarding any and all "adverse health effects." 597 F.Supp. at 869.

Nevertheless, tort law accords juries wide discretion, and the existence of any substantial number of serious plaintiffs would create a dangerous exposure for the chemical companies. It is true that $180 million is a lot of money. If even a small number of plaintiffs had gone on to prevail at trial, however, the actual exposure of the chemical companies might well have been measured instead in the billions of dollars. Jury verdicts of several million dollars for disabling ailments or injuries to children are not uncommon. If, in the present litigation, each serious claim had a settlement value of $500,000, the $180 million would cover only 360 plaintiffs. Indeed, the $180 million is at best only a small multiple of, at worst less than, the fees the chemical companies would have had to pay to their lawyers had they continued the litigation. However large a sum $180 million may be, therefore, we must conclude that in the circumstances it was essentially a settlement at nuisance value.

We believe, however, that the PMC had good reason to view this case as having only nuisance value. Chief Judge Weinstein's opinion sets out the various weaknesses of plaintiffs' case in great and persuasive detail, *Settlement Opinion,* 597 F.Supp. 740 (E.D.N.Y.1984), and our discussion assumes familiarity with that opinion.

The difficulties begin with the conceded fact that all of the various ailments afflicting the plaintiffs occur in the population generally and have known and unknown

causes other than exposure to dioxin. *Id.* at 782–83. Studies based on industrial accidents and experiments with animals suggest that exposure to dioxin may cause various of those ailments. *Id.* at 780. However, these studies involve different dosages and different species than are involved in this litigation. Studies of Vietnam veterans themselves fail to demonstrate ailments occurring among them at a statistically abnormal rate. *See id.* at 787–88. The weight of present scientific evidence thus does not establish that personnel serving in Vietnam were injured by Agent Orange. *See* III *Review of Literature on Herbicides, Including Phenoxy Herbicides and Associated Dioxins,* II–8 to II–10 (1984) (Joint Appendix Vol. XIII at 5828–29).

The Ranch Hand Study compared health records of Air Force personnel involved in handling and spraying Agent Orange with those of Air Force personnel who performed other tasks. It concluded that there is little difference in the health histories of the two groups. *See* 597 F.Supp. at 782, 784, 788. Other studies, including many done by federal, state, and foreign governments, compared the incidence of various ailments among Vietnam veterans to their incidence among civilian populations. These studies also concluded there are no statistically significant differences. *See id.* at 787–95.

Such studies are, of course, not conclusive. The Ranch Hand Study, for example, involved personnel who ate and slept at their home bases and were able to take regular showers, whereas the plaintiffs were predominantly infantry alleging exposure to Agent Orange through spraying or ingestion of local food and water. *Id.* at 788. Although it is by no means clear that the plaintiffs suffered greater exposure than did the Air Force personnel who actually handled the herbicide, the circumstances of exposure were clearly different. There are, moreover, some inconclusive anomalies in the Ranch Hand findings. *Id.*

Conclusions as to the effects of Agent Orange reached by studies comparing Vietnam veterans with civilians are weakened by the fact that portions of the civilian population may also have been exposed to dioxin. *See id.* at 782 ("as one expert put it, 'all of us have probably been exposed to dioxin at some time' "). The similar incidence of diseases in the two groups thus does not absolve Agent Orange. Nevertheless, the facts that the studies do not exclude the possibility of injury and that evidence of such injury may someday be found cannot obscure the paucity of present evidence that Agent Orange injured the plaintiffs. Indeed, plaintiffs' own evidence of dioxin's toxicity partly undermines their case. That evidence establishes that chloracne is a leading indicator of harmful exposure to dioxin, yet verified cases of chloracne among Vietnam veterans are rare. *Id.* at 794–95.

At bottom, the individual veterans' cases would consist of oral testimony that each had been in an area where Agent Orange was used, that studies of industrial accidents and animal experiments show that dioxin is harmful, and that the plaintiff suffers from a particular ailment. Medical testimony would indicate a causal relationship. The defendants' case would consist largely of evidence that each of these ailments has many unknown causes, that most of the ailments usually cannot be attributed to a particular cause, and that each exists among many persons not exposed to Agent Orange. As a concrete example, a plaintiff might testify to presence in an area in South Vietnam where Agent Orange was used and development of a cancer some years later. Medical testimony would again indicate a causal relationship. The defendants would show that thousands of similar cancers without traceable cause are statistically predictable among persons not exposed to Agent Orange and that no greater incidence of such cancers has been found among Vietnam veterans than among the population generally.

The problems of proving causation are thus substantial. This is illustrated by the scientific evidence offered by the opt-outs in response to the defendants' motion for

summary judgment.[5] *See Opt-Out Opinion*, 611 F.Supp. 1223; *In re "Agent Orange" Product Liability Litigation (Lilley v. Dow Chemical Co.)*, 611 F.Supp. 1267 (E.D.N.Y.1985) (individual opt-out claim brought by veteran's widow). Their experts relied heavily upon studies of industrial accidents and animals that are of marginal relevance to this case. *See Opt-Out Opinion*, 611 F.Supp. at 1236, 1238. Also, some of the expert opinions as to individual causation were often highly tentative or subject to impeachment. *See Lilley v. Dow Chemical Co.*, 611 F.Supp. at 1273; *Opt-Out Opinion*, 611 F.Supp. at 1236–38, 1252–54, 1265–66.

The factual weakness of the plaintiffs' case is further revealed by the difficulty of proving details about exposure to Agent Orange. The events in question occurred many years ago, and exposure through ingestion of water or food is a matter of considerable speculation. Nevertheless, given the nature of the scientific evidence, the character of exposure is a critical element.

Plaintiffs also face formidable legal problems in establishing liability. Each plaintiff would encounter a choice of law issue that might be resolved adversely to his or her claim. As Chief Judge Weinstein recognized, the substantive law of product liability varies from state to state, and the question of which state's law would apply to a particular case is not easily answered. *See* 580 F.Supp. 690, 693–701 (E.D.N.Y. 1984). *See also Class Certification Opinion*, 100 F.R.D. 718, 724 (E.D.N.Y.1983). No single state has an overriding interest in this litigation because the alleged injuries resulted from exposure to toxic materials in a foreign country while the veteran plaintiffs were serving in the armed forces. Chief Judge Weinstein concluded that each tribunal addressing a claim by an individual plaintiff would apply a national consensus law. 580 F.Supp. at 713. Viewed as an academic discussion of an interesting choice of law problem, his analysis is, as we noted, bold and imaginative. Viewed as

a prediction of what particular jurisdictions would do in individual cases, however, his conclusion is patently speculative. Moreover, even if a national consensus law were developed and applied, there is no guarantee that it would be favorable to the plaintiffs.

Other legal problems facing the plaintiffs concern the applicability of various state statutes of limitations. These were discussed in detail by Chief Judge Weinstein in his opinion approving the settlement, 597 F.Supp. 740, 800–816 (E.D.N.Y. 1984), and we have little to add to that discussion other than to express skepticism that all plaintiffs would overcome the defense that their claims were time barred.

Finally, the plaintiffs might have difficulty establishing the liability of any particular defendant because each defendant's version of Agent Orange contained different amounts of dioxin and because the government mixed the products of the various manufacturers in unmarked barrels. It is therefore impossible to attribute the exposure of an individual to Agent Orange to the product of a particular company. It is possible, moreover, that only the herbicide with the greater amounts of dioxin was hazardous. As Chief Judge Weinstein noted in his opinion, *id.* at 819–33, various legal theories might enable plaintiffs to establish liability against each manufacturer, but there is no guarantee that any of these theories would be adopted.

The plaintiffs had a final and in our view impossible, hurdle to surmount, namely the military contractor defense. The detailed elaboration of our views of that defense can be found in the opinion that discusses the opt-outs' appeal from the grant of summary judgment. We need note here only that in affirming the grant of summary judgment against the opt-outs, we act on our belief that defendants clearly did not breach any duty to inform the government of hazards relating to Agent Orange. First, we agree with Chief Judge Weinstein that a reasonable trier of fact would have to have found that during the

---

**5.** This evidence came into the record after approval of the settlement. Because it supports appellants' position, they are not prejudiced by our consideration of it.

time when the defendants had a duty to inform the government of known hazards, the government had as much knowledge as the defendants of the dangers of dioxin, then relating largely to chloracne and a rare liver disease. *See Opt-Out Opinion,* 611 F.Supp. at 1263. Second, we believe that the military contractor defense shields defendant contractors from liability where the hazard is wholly speculative. Even if this were a case in which causation was now clear and the issue was whether the hazard was known when Agent Orange was sold to the government, the plaintiffs would have difficulty establishing a breach of a duty to inform. Establishing such a duty on the facts here is impossible, however. In the light of hindsight, some 15 to 20 years after the fact, the weight of present scientific evidence does not establish that personnel in Vietnam were injured by Agent Orange, and there cannot have been a breach of an earlier duty to inform the government of known hazards.

 We conclude that all the plaintiffs in this litigation faced formidable hurdles. The settlement was therefore reasonable. We reach this conclusion even though we recognize that the PMC's fee agreement created a conflict of interest that generated impermissible incentives on the part of class counsel to settle, as set forth in Judge Miner's companion opinion. Whatever effect the invalidation of that agreement might have had on a settlement in a strong liability case, it does not affect the instant settlement because of the grave weaknesses in plaintiffs' case.

Affirmed.

## APPENDIX

Chief Judge Weinstein's order with respect to notice to the members of the class provided as follows:

(a) Plaintiffs' counsel, at their own expense, shall cause a copy of the written notice, attached as Exhibit A, to be mailed by first class United States mail to all persons who have filed actions as plaintiffs in the District Courts of the United States, or filed actions in state courts later removed to a federal court, which are pending in or have been transferred to this court for consolidated proceedings by the Panel on Multi-District Litigation, together with all persons who have moved to intervene or are intervenors, and each class member presently represented by counsel associated with plaintiffs' management committee who has not yet commenced an action or sought intervention. Mailing of the notice shall take place within 30 days of this Order.

(b) Plaintiffs' counsel, at their own expense, shall cause to be mailed a copy of the written notice to all persons who are currently listed on the United States Government's Veteran's Administration "Agent Orange Registry." This mailing shall take place within 50 days of this Order.

(c) Notice shall be mailed in envelopes that are printed only with the names of the addressee and the Clerk of this Court. Plaintiffs' counsel shall maintain a record of the name and address of each person to whom the notice is mailed. The record shall be filed with the Clerk of the Court not later than 70 days after the issuance of this Order.

(d) Plaintiffs' counsel, at their own expense, shall obtain a post office box in Smithtown, New York, 11787, in the name of the Clerk of the Court, and advise the court and the parties of the box number not later than 15 days after the issuance of this Order. The box shall be rented until further order of the court. Plaintiffs' counsel shall on a daily basis review the contents of the post office box and prepare a listing of all exclusion requests received, which shall be available to the court and the parties for inspection and copying, together with the exclusion requests. Plaintiffs' counsel shall send a copy of the notice and the exclusion request form to each person who writes to the Clerk of the Court requesting them. Each day plaintiffs' counsel shall transmit to the court and the parties copies of any communications (other than exclusion requests or requests for forms) that are received at the post office box. Plaintiffs' counsel shall

maintain a record, together with the originals, of all mail returned as undelivered.

(e) Plaintiffs' counsel, at their own expense, shall serve a radio and television announcement notice in the form of Exhibit B on the nationwide networks of the American Broadcasting Company, the Columbia Broadcasting System, the Mutual Broadcasting System, the National Broadcasting Company, and the Public Broadcasting and Television Networks and on radio stations with a combined coverage of at least 50 percent of the listener audience in each of the top one hundred radio markets in the United States within 50 days of this Order.

Along with the radio and television notice served upon the nationwide radio and television broadcasting systems and radio stations, plaintiffs' counsel shall request that the notice be read as set forth in Exhibit B without interruption or comment, either alone or in conjunction with the showing on television of the text of Exhibit B. Plaintiffs' counsel shall request that each participating radio and television broadcasting station advise them of the dates and times at which the notice was broadcast or shown.

Within 90 days of this Order, plaintiffs' counsel shall furnish to the court and the parties a report identifying the name and location of each radio station broadcasting the announcement, if known, and the date and time of each announcement. The court will then determine if further notice is required.

(f) Plaintiffs' counsel, at their own expense, shall publish in the following newspapers and magazines an announcement in two successive weeks (but if publication is monthly, only once) in the form of Exhibit C: the nationwide edition of *The New York Times, U.S.A. Today, Time Magazine, the American Legion Magazine, VFW Magazine, Air Force Times, Army Times, Navy Times,* and the *Leatherneck;* the ten largest circulation newspapers in Australia, including *The Australian;* and the five largest daily circulation newspapers in New Zealand, including *The Dominion.* Publication shall be completed as soon as practi-

cable, but no later than March 1, 1984. The size of the notice shall be not less than one-eighth, nor more than one-third, of the newspaper or magazine page.

(g) Plaintiffs' counsel shall, at their own expense, obtain a toll-free "800" telephone number in the name of the Clerk of the Court. The number shall be in effect no later than January 1, 1984 to at least May 1, 1984. The number shall be manned on a daily basis, from at least Monday to Friday, 9:00 a.m. to 5:00 p.m., E.S.T., with knowledgeable persons (or a recorded announcement and recording device) who shall tell callers where to write for further information, but who shall not give advice concerning rights and responsibilities in this litigation. A record of those calling and giving their names and addresses shall be kept. Those requesting a copy of Exhibit A shall be sent one. No oral exclusion request shall be taken. Plaintiffs' counsel shall give written instructions to those answering the phone. A copy of such instructions and any recorded announcement shall be filed with the Clerk.

(h) The Clerk of the Court shall send this order and notice to the Governor of each of the states of the United States. He shall respectfully request each Governor to refer the notice to any state organization created by the executive or legislative branches dealing with the problems of Vietnam veterans and request that the notice be sent to all those known Vietnam veterans who may be members of the class described in the Order, or that a list of names and addresses be supplied to this court so that notice may be mailed by the plaintiffs' counsel. The Clerk shall respectfully request a list of those to whom notice has been sent by any state agency.

\* \* \* \* \* \*

*Exhibit A*

### LEGAL NOTICE TO CLASS MEMBERS OF PENDENCY OF CLASS ACTION

This notice is given to you pursuant to an Order of the United States District Court for the Eastern District of New York and Rule 23(c)(2) of the Federal Rules of Civil Procedure. It is to inform you of the pendency of a class action in which you may be

a member of the class, and of how to request exclusion from the class if you do not wish to be a class member. None of the claims described below have been proven. It is contemplated that a trial by court and jury will take place in this court beginning in May, 1984.

1. There are now pending in the United States District Court for the Eastern District of New York claims brought by individuals who were in the United States, New Zealand, or Australian Armed Forces assigned to or near Vietnam at any time from 1961 to 1972, who allege personal injury from exposure to "Agent Orange" or other phenoxy herbicides, including those composed in whole or in part of 2,4,-5–trichlorophenoxyacetic acid or containing some amount of 2,3,7,8–tetrachlorodibenzo-p-dioxin (collectively referred to as "Agent Orange").

2. The plaintiffs include spouses, parents, and children born before January 1, 1984, of the servicepersons who claim direct or derivative injury as a result of exposure. Plaintiffs include children asserting claims in their own right for genetic injury and birth defects caused by their parents' exposure to "Agent Orange" and other phenoxy herbicides. Wives of veterans exposed to "Agent Orange" in Vietnam seek to recover in their own right for miscarriages. Plaintiffs' theories of liability include negligence, strict products liability, breach of warranty, intentional tort and nuisance. Damage claims of family members include pecuniary loss for wrongful death, loss of society, comfort, companionship, services, consortium, guidance and support. In addition, plaintiffs seek punitive damages for defendants' alleged misconduct in furnishing herbicides to the United States Government.

3. The defendants, who are alleged to have manufactured or sold "Agent Orange" to the United States Government, are Dow Chemical Company, Monsanto Company, T.H. Agriculture & Nutrition Company, Inc., Diamond Shamrock Chemicals Company, Uniroyal, Inc., Hercules Incorporated, and Thompson Chemical Corporation. All the defendants deny that the plaintiffs' alleged injuries were in any way caused by "Agent Orange." They assert that injury, if any, was not caused by a product produced by them. The defendants have challenged these suits on various other grounds including plaintiffs' lack of standing to sue, lack of jurisdiction, statutes of limitation, insufficiency in law, plaintiffs' contributory negligence, and plaintiffs' assumption of known risks. Each has also asserted such affirmative defenses as the "government contract defense" and the Government's misuse of its product. In third-party complaints, the defendants asserted claims against the United States of America seeking indemnification or contribution in the event the defendants are held liable to the plaintiffs. The Government has asserted its power to prevent anyone from suing it.

4. This court has certified a class action in this proceeding under Rule 23(b)(3) of the Federal Rules of Civil Procedure. The plaintiff class consists of those persons who were in the United States, New Zealand, or Australian Armed Forces assigned to Vietnam at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to "Agent Orange" or other phenoxy herbicides including those composed in whole or in part of 2,4,5–trichlorophenoxyacetic acid or containing some amount of 2,3,7,8–tetrachlorodibenzo-p-dioxin. The class also includes spouses, parents, and children born before January 1, 1984, directly or derivatively injured as a result of the exposure.

The court may reconsider this decision, by decertifying, modifying the definition of the class, or creating subclasses in the light of future developments in the case. The definition does not imply a conclusion that anyone within the class was injured as a result of exposure to any herbicide.

5. The court has also certified a Rule 23(b)(1)(B) class limited to claims for punitive damages. The class includes the same persons as are in the Rule 23(b)(3) class. The court has decided not to permit members of the class to seek exclusion on the issue of punitive damages. You will therefore be bound by the court's rulings on

punitive damages whether or not you seek exclusion on the issue of compensatory damages.

6. Trial of the representative plaintiffs' claims is scheduled to commence before Jack B. Weinstein, Chief Judge of the United States District Court for the Eastern District of New York, and a jury on May 7, 1984.

7. If you are a member of the plaintiff class you will be deemed a party to this action for all purposes unless you request exclusion from the Rule 23(b)(3) class action covering compensatory damages.

8. If you do not request exclusion from the class by May 1, 1984, you will be considered one of the plaintiffs of this class action for all purposes. You may enter an appearance through counsel of your own choice. You will be represented by counsel for the class representatives unless you choose to enter an appearance through your own legal counsel.

9. Class members who do not request exclusion will receive the benefit of, and will be bound by, any settlement or judgment favorable to the class covering compensatory damages. The class representatives' attorneys fees and costs will be paid out of any recovery of compensatory and other damages obtained by the class members. You will not be charged with costs or expenses whether or not you remain a member of the class. However, if you choose to enter an appearance through your own legal counsel, you will be liable for the legal fees of your personal counsel.

10. Class members who do not request exclusion will be bound by any judgment adverse to the class, and will not have the right to maintain a separate action even if they have already filed their own action.

11. If you wish to remain a member of the class for all purposes, you need do nothing at this stage of the proceedings.

12. *If you wish to be excluded from the class for compensatory damages, you must submit a written request for exclusion.* For your convenience, the request for exclusion may be submitted on the attached form, entitled "Request for Exclu-

sion." If you received this notice by mail, a Request for Exclusion form should have accompanied it. If you did not receive a Request for Exclusion form, you may obtain a copy by writing to the Clerk of the Court, P.O. Box __, Smithtown, New York 11787. A written Request for Exclusion may be submitted without using the Request for Exclusion form, but it must refer to the litigation as "In re 'Agent Orange' Product Liability Litigation, MDL No. 381": include your name and address in your statement requesting exclusion. Any request for exclusion must be received on or before May 1, 1984 by the Clerk of the United States District Court for the Eastern District of New York at Post Office Box __, Smithtown, New York 11787 or at a federal courthouse in the Eastern District of New York.

13. Under the court's Order, all potential plaintiffs are deemed to be members of a Rule 23(b)(1)(B) class on the issue of punitive damages. At the time of trial the court will determine whether the facts presented warrant the submission of a punitive damage claim to the jury. In the event that there is a recovery for punitive damages, it will be shared by those plaintiffs who are successful in prosecuting their claims in this or other suits on an appropriate basis to be determined by the court. If you choose to exclude yourself from this class action on the issue of compensatory damages, you may do so without necessarily losing your right to share in any punitive damages.

14. The plaintiffs in this class action are represented by a group of attorneys who have been tentatively approved by the Court as the Agent Orange Plaintiffs' Management Committee. Members of this committee include:

Phillip E. Brown, Esq.
Hoberg, Finger, Brown,
Cox & Molligan
703 Market St. (18th Floor)
San Francisco, CA 94103

Thomas W. Henderson, Esq.
Baskin & Sears
Frick Building (10th Fl.)
Pittsburgh, PA 15219

Stanley M. Chesley, Esq.
Waite, Schneider, Bayless
and Chesley Co., L.P.A.
1513 Central Trust Tower
Fourth and Vine Streets
Cincinnati, Ohio 45202

Benton Musselwhite, Esq. &
John O. O'Quinn, Esq.
609 Fannin (Suite 517)
Houston, Texas 77002

David J. Dean, Esq.
Dean, Falanga & Rose
One Old Country Road

Stephen J. Schlegel, Esq.
Schlegel & Trafelet, Ltd.
One North LaSalle Street

Carle Place, New York 11514 Suite 3900 Chicago, Illinois 60602

Newton B. Schwartz, Esq.
Houston Bar Center Building
722 Main (Suite 325)
Houston, Texas 77002

David J. Dean, Esq. has been designated by the court as plaintiffs' spokesman. The Management Committee is being aided in its duties of representing the interests of the plaintiffs by other law firms in the United States and abroad.

15. *Examination of pleadings and papers.* This notice is not all inclusive. References to pleadings and other papers and proceedings are only summaries. For full details concerning the class action and the claims and defenses which have been asserted by the parties, you or your counsel may review the pleadings and other papers filed at the office of the Clerk of the United States District Court for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201, on any business day from 9:00 a.m. to 5:00 p.m.

16. *Interpretation of this Notice.* Except as indicated in the orders and decisions of the United States District Court for the Eastern District of New York, no court has yet ruled on the merits of any of the claims or defenses asserted by the parties in this class action. This notice is not an expression of an opinion by the court as to the merits of any claims or defenses. This notice is being sent to you solely to inform you of the nature of the litigation, your rights and obligations as a class member, the steps required should you desire to be excluded from the class, the court's certification of the class, and the forthcoming trial.

----

Robert C. Heinemann
Clerk, United States District
Court for the Eastern District
of New York

DATED: Brooklyn, New York
January 12, 1984

EXCLUSION REQUEST FORM

Clerk
United States District Court
for the Eastern District of New York

P.O. Box ___
Smithtown, New York 11787
Re: In re "Agent Orange" Product Liability Litigation MDL No. 381

----

I hereby request to be excluded from the class action in the above-captioned matter.

_____
(signature)

Name (print): _____

Address: _____

If not a member of the armed forces who served in or near Vietnam, how are you related to such a serviceperson? _____

Armed Forces unit of serviceperson _____

Armed Forces identifying number of serviceperson _____

Period of service in or near Vietnam _____

I learned about this suit by _____

*Exhibit B*

*(Radio and Television Communication)*

## SPECIAL ANNOUNCEMENT

Were you or anyone in your family on military duty in or near Vietnam at any time from 1961 to 1972? If so, listen carefully to this important message about a pending "Agent Orange" lawsuit that may affect your rights.

If you or anyone in your family claim injury, illness, disease, death, or birth defect as a result of exposure to "Agent Orange," or any other herbicide in or near Vietnam at any time from 1961 to 1972, you are now a member of a class in an action brought on your behalf in the United States District Court for the Eastern District of New York, unless you take steps to exclude yourself. The class is limited to those who were injured by exposure to Agent Orange or any other herbicide while serving in the armed forces in or near Vietnam at any time from 1961 to 1972. The class also includes members of families who claim derivative injuries such as those to spouses and children.

The court expresses no opinion as to the merit or lack of merit of the lawsuit. It

has ordered that this message be transmitted to give as many persons as is practicable notice of this suit.

For details about your rights in this "Agent Orange" class action lawsuit, call 1–800–__, or write to the Clerk of the United States District Court, Box __, Smithtown, New York 11787. That address again is Clerk of the United States District Court, P.O. Box __, Smithtown, New York 11787, or call 1–800–__.

*EXHIBIT C*

*(Newspaper and Magazine Notice)*

TO ALL PERSONS WHO SERVED IN OR NEAR VIETNAM AS MEMBERS OF THE ARMED FORCES OF THE UNITED STATES, AUSTRALIA AND NEW ZEALAND FROM 1961–1972

If you or anyone in your family can claim injury, illness, disease, death or birth defect as a result of exposure to "Agent Orange" or any other herbicide while assigned in or near Vietnam at any time from 1961 to 1972, you are a member of a class in an action brought on your behalf in the United States District Court for the Eastern District of New York unless you take steps to exclude yourself from the class. The class is limited to those who were injured by exposure to "Agent Orange" or any other herbicide while serving in the armed forces in or near Vietnam at any time during 1961–1972. The class also includes members of families who claim derivative injuries such as those to spouses and children.

The court expresses no opinion as to the merit or lack of merit of the lawsuit. 100 F.R.D. at 729–35.