**J.T. IKONEN and Yvonne Grantham, on behalf of themselves and all others similarly situated, inclusive, Plaintiffs,**

v.

**HARTZ MOUNTAIN CORPORATION, a New Jersey corporation, Defendant.**

**Civ. No. 87–1275–R(IEG).**

United States District Court,
S.D. California.

Sept. 20, 1988.

Michael Pines, Michael Goldstein, C. Daniel Carroll, of Pines, McCann & Goldstein, Oceanside, Cal. (Herbert B. Newberg, Philadelphia, Pa., of counsel), for plaintiffs.

Maureen McGuirl, David P. Restaino, John B. Scherling, of Gibson, Dunn & Crutcher, San Diego, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

GORDON THOMPSON, Jr., Chief Judge.

### I. FACTS AND PROCEDURAL HISTORY

"Blockade" is an aerosol flea and tick spray made by defendant Hartz Mountain Corporation (Hartz). Blockade contains "DEET" and "fenvalerate" as active ingredients. Plaintiffs assert that these chemicals poison animals when applied to their skin.

Hartz first placed Blockade on the market for sale on January 1, 1987. Hartz conducted an extensive television and radio advertising campaign to promote it. By September 1, 1987, Hartz had sold 5.5 million cans of Blockade. Although Blockade's labels described the beneficial effects of its use, they contained no directions on the recommended dosage or frequency of application. Apparently, after reading the directions on the labels, plaintiffs Yvonne Grantham and J.T. Ikonen sprayed their pets with Blockade. The pets allegedly showed symptoms of poisoning, such as tremors, hypersalivation, diarrhea, vomiting, ataxia, and seizures.

Hartz began receiving complaints on Blockade-related poisonings within a few months after Blockade appeared on the market. While Blockade was available for sale, Hartz apparently received over 3,000 complaints. The Illinois Animal Poison Information Center, which has been documenting the effects of Blockade on animals, also allegedly alerted Hartz about other poisonings. Although many petowners took their animals to veterinarians for treatment of poisoning, many pets still died or suffered lasting neurological and physical injuries.

Plaintiffs first moved for a temporary restraining order, or in the alternative for a preliminary injunction, in December, 1987 to force Hartz to remove Blockade from the market. They also moved to certify a nationwide class of petowners whose pets were harmed by Blockade. Hartz countered by filing a motion to dismiss plaintiffs' complaint. Hartz voluntarily removed Blockade from the market before plaintiffs' motion for a temporary restraining order was heard, and Judge John S. Rhoades, Sr. of this court denied Hartz' motion to dismiss in May, 1988. The motion for class certification remains to be decided.

### II. DISCUSSION

#### a. *Personal Jurisdiction*

Hartz argues that *Phillips Petroleum v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), prevents certification of a national class here because this court may not assert *in personam* jurisdiction over all potential class members. *Shutts* noted that the traditional "minimum contacts" test for *in personam* jurisdiction of *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), was necessary to protect defendants from

being unreasonably burdened by defending against lawsuits in inconvenient fora. 472 U.S. at 808, 105 S.Ct. at 2972–73.

However, *Shutts* then found that:

[a] class-action plaintiff ... is in quite a different posture.... [A] "class" or "representative" suit [is] an exception to the rule that one could not be bound by judgment *in personam* unless one was made fully a party in the traditional sense.... [T]he class action was an invention of equity to enable courts to proceed to a decree in suits where the number of those interested in the litigation was too great to permit joinder. The absent parties would be bound by the decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest. 472 U.S. at 808, 105 S.Ct. at 2972–73.

The case at bar only concerns class action plaintiffs, not defendants. As following sections of this opinion will show, the potential class is too large to permit joinder, and absent parties that did not opt out of the class would be bound by a judgment here. There are therefore no *in personam* jurisdiction problems in this case.

### b. *Notice*

■ Hartz argues that the Due Process Clause of the United States Constitution, as interpreted by the Supreme Court in *Shutts,* requires each class member to receive *actual* notice of the class action. Hartz notes that the *Shutts* Court stated that:

[i]f the forum state wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. 472 U.S. at 811–12, 105 S.Ct. at 2974.

However, immediately after making this statement, *Shutts* further stated that "[t]he notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'", and especially to opt out of the class to pursue their own cases. *Id.* at 812, 105 S.Ct. at 2974 (quoting *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). *Shutts* further cites *Mullane* for the proposition that "notice reasonably certain to reach most of those interested in objecting [to inclusion in the class] is likely to safeguard the interests of all...." *Shutts,* 472 U.S. at 812, 105 S.Ct. at 2974–75 (citing *Mullane,* 339 U.S. at 319, 70 S.Ct. at 660).

Therefore, the Supreme Court does not require actual notice for all members of a class in every class action. With so many potential class members here, other forms of notice, such as notice by mail, publication, and radio and television broadcast, could be the "best practicable" under the circumstances.

### c. *Federal Rule of Civil Procedure 23(a)*

To certify a class, plaintiffs must first meet the requirements of Federal Rule of Civil Procedure 23(a), which reads:

*Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

### 1.

#### Numerosity/Impracticability of Joinder

■ When considering numerosity and the impracticability of joinder, it is unnecessary for the class representatives to either identify each particular member of a class, or to state the exact number of persons in a class. Instead, trial judges may reasonably infer if numerosity is satisfied from the facts of each particular case. *Doe v.*

*Charleston Area Medical Center,* 529 F.2d 638, 645 (4th Cir.1975); *Jones v. Diamond,* 519 F.2d 1090, 1100 (5th Cir.1975); *In re Asbestos School Litigation,* 104 F.R.D. 422, 428 (E.D.Pa.1984), *aff'd in part on other grounds sub nom. In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir. 1986), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). If it is readily apparent that the size of the potential class would make joinder impossible, then numerosity is met. *Asbestos School Litigation,* 104 F.R.D. at 428; *Peil v. National Semiconductor,* 86 F.R.D. 357 (E.D.Pa. 1980). A further consideration in determining numerosity is whether or not prosecution of individual cases would severely burden the judiciary. *In re Federal Skywalk Cases,* 95 F.R.D. 483, 485 (W.D.Mo.1982). As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23–05[1] (2d ed. 1987).

Hartz sold over 5.5 million cans of Blockade, and alone received over 3,000 complaints from those sales. The Illinois Animal Poison Information Center has also recorded 675–700 cases of poisoning or suspected poisoning supposedly caused by Blockade. Plaintiffs' counsel claims to have been contacted by at least 100 people whose pets were allegedly harmed by Blockade. Joinder of all potential parties would therefore be impossible, and the potential class is easily big enough to meet the numerosity requirement.

### 2. Commonality

To satisfy commonality, questions of fact or law must be common to the class. It is not necessary for both common questions of law and common questions of fact to exist. *Taliaferro v. State Council of Higher Education,* 372 F.Supp. 1378 (E.D. Va.1974). Courts have sometimes found that commonality is met where a single common issue, namely a thread of commonality, runs through the case. *Id.; Asbestos School Litigation,* 104 F.R.D. at 429.

However, in *In re Northern District of California, Dalkon Shield IUD Products Liability Litigation,* the Ninth Circuit found that despite common issues " 'of design, testing, manufacturing, labeling and inspection of Dalkon Shields' " in cases where Dalkon Shields had injured women, "on the issues of negligence, strict products liability, adequacy of warnings at relevant time periods, breach of warranty, fraud and conspiracy, commonality begins to be obscured by individual case histories." 693 F.2d 847, 854 (9th Cir.1982). The Ninth Circuit concluded by remarking that:

> [d]ifferent questions of law and fact could apply to various plaintiffs in the ... class because of different representations and warnings made to each woman, different injuries suffered, and different defenses available [to the defendants]. The commonality requirement of Rule 23(a)(2) is not, of itself, insurmountable, but problems of commonality merge into problems of management. *Id.*

Here, as in *Dalkon Shield,* there will be common issues of design, testing, manufacturing, and labeling. However, the individual case histories of the pets of each class member will all involve different negligence, strict products liability, breach of warranty, fraud, and adequacy of warning issues. In this case, as in *Dalkon Shield,* "problems of commonality" exist.

### 3. Typicality

The class representatives' claims must be typical of those of the rest of the class. This requirement is met if the representatives' claims do not conflict with the claims of other class members. *In re Glassine & Greaseproof Paper Antitrust Litigation,* 88 F.R.D. 302 (E.D.Pa.1980). Some courts have found that "[t]he relative simplicity of the typicality requirement is summed up as follows: a plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *See, e.g., Paskel v. Heckler,* 99 F.R.D. 80, 84 (E.D.Pa. 1983).

However, in *Dalkon Shield* the Ninth Circuit noted that:

> [i]n proving liability under a negligence theory, ... the plaintiffs have to prove not only their injuries, but that ... defendant owed them a duty of care and also what [the standard of care was], if [it was] breached, and—most important —if the breaches proximately caused the plaintiffs' varying injuries.... To prove liability under a breach of warranty theory, representative plaintiffs must exist for each type of warranty, assurance, or medical advice each plaintiff received. The difficulty of meeting the typicality requirement seems obvious. 693 F.2d at 855.

Here, each animal will have been injured in different ways and to different degrees by Blockade. Each pet owner, for purposes of *emotional distress claims*, will have been affected in different ways and to different degrees by the loss of their pets. It would be necessary to decide whether Blockade proximately caused such harm in each individual case. Plaintiffs have also not shown that representative plaintiffs exist for each subgroup of class members for the breach of warranty claims, or that such representatives would join the suit if eventually found. Plaintiffs thus have not met the requirement of typicality, either.

### 4. Adequacy of Representation

■ Rule 23(a)(4) requires that:

> the representative parties ... fairly and adequately protect the interests of the class. Adequacy of representation depends on the qualifications of counsel for the representatives, an absence of antogonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive. *Dalkon Shield*, 693 F.2d at 855.

Here, plaintiffs are represented by Professor Herbert Newberg, who is the author of an important treatise on class actions, and a local firm with experience in conducting plaintiff tort suits. Counsel for the representatives is therefore very well qualified. No evidence of antagonism between the named plaintiffs and absent class members has emerged. The representatives and absentees share interests in recovering from Hartz should Blockade be found to have poisoned their pets. Collusion also appears to be absent. Representation is adequate in this case.

### d. *Federal Rule of Civil Procedure 23(b)(3)*

Plaintiffs wish to certify a class under Federal Rule of Civil Procedure 23(b)(3). This rule provides that a suit may proceed as a class action if the requirements of Rule 23(a) are met, and if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In commenting on this provision, the Rules Advisory Committee stated that:

> [a] "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate into multiple lawsuits separately tried. Fed.R.Civ.P. 23(b)(3) advisory committee's note.

Because of the problems pointed out by this statement, courts historically have been very reluctant to certify classes in mass tort cases. 3 H. Newberg, *Newberg on Class Actions* § 17.02.

However, this does not mean that a class action is never appropriate in mass tort cases. Courts have been receptive to certifying classes in mass accident cases such as those involving aviation disasters, which often involve one event and easily identifiable victims, and toxic environmental tort cases, which also often arise out of single events. *Id.* § 17.06. In addition, recent cases indicate that the reluctance of federal courts to certify classes in other mass tort cases is eroding. *See, e.g., In re Asbestos School Litigation,* 104 F.R.D. at 429 (certifying national class of children harmed by asbestos in schools); *In re Agent Orange Product Liability Litigation,* 100 F.R.D. 718, 724 (E.D.N.Y.1983) (certifying class of individuals harmed by the exposure of American, Australian, and New Zealand Vietnam War veterans to Agent Orange.

Class actions may very well be the best means available to redress mass repetitive wrongs, especially in mass tort cases involving small claimants, where the potential damages that the claimants could recover would likely be insignificant when compared with the costs of conducting individual litigation. The Supreme Court itself has recognized that "[c]lass actions may permit the plaintiffs to pool claims which would be uneconomical to litigate individually. For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available." *Shutts,* 472 U.S. at 809, 105 S.Ct. at 2973.

Here, some potential class members may only be able to recover for the loss of their animals, and for veterinary fees incurred in caring for them, should a trial reveal that Blockade injured the animals. For such persons, it could possibly be too expensive to conduct discovery and arrange for the appearance of expert witnesses for their individual cases. It is therefore necessary to be especially careful in examining the requirements for certifying a class under Rule 23(b)(3) before deciding whether or not a class action is appropriate here.

### 1. Predominance

Predominance under Rule 23(b)(3) is essentially a balancing test pitting the common factual questions involving a potential class against questions concerning individual class members. *Dalkon Shield,* 693 F.2d at 856. The primary danger here is that a class action would degenerate into a mass of individual claims.

Here, each class member would argue general issues such as the hazardous nature of Blockade, whether Blockade was defective, which active ingredients in Blockade harm animals when applied to their skin, whether Hartz warned of the potential dangers of those ingredients, and whether Hartz misled people into thinking that Blockade is a safe product.

However, the Ninth Circuit has found that, in Rule 23(b)(3) products liability class actions,

individual issues may outnumber common issues. No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant. Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of risk, contributory negligence ... ) may depend on facts peculiar to each plaintiff's case. *Dalkon Shield,* 693 F.2d at 853.

Here, physiological differences among the pets of class members, such as species, weight, size, age, and health, may affect proof of causation in each case. The circumstances of each animal's exposure to Blockade, such as the time and place of exposure and whether each animal was exposed to other harmful chemicals, would also be relevant to causation determinations. Different affirmative defenses would almost certainly apply to each case. These individual issues, which would have to be decided for a class which could eventually consist of many thousands of members, overwhelms the existing common, general issues.

Here, plaintiffs attempt to avoid this problem by arguing that generic causation issues, such as whether Blockade is harmful at all, may be tried in a "phase 1" trial, with individualized causation issues, such as whether Blockade harmed a particular class member's pet, being decided later on an individual basis. This argument is not persuasive. The Second Circuit confronted similar arguments in *In re Agent Orange Products Liability Litigation*, 818 F.2d 145, 164 (2d Cir.1987). There, the court found that:

> [t]he relevant question ... is not whether [a toxic substance] has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual[s] and the nature of their exposure.... Although generic causation and individual circumstances concerning ... exposure ... thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and ... individual[ ] exposure. 818 F.2d at 165 (emphasis in original).

Another problem with certifying a class here is that there would be few, if any, common questions of law because the laws of different states would apply to different claims, depending on where those claims arose. Plaintiffs argue that there is widespread agreement among the states on many issues of negligence, breach of warranty, and products liability law, and that this agreement minimizes these potential choice of law difficulties. However, "widespread agreement" does not entirely eliminate potentially troublesome choice of law problems. *Agent Orange*, 818 F.2d at 165. The law of each state would still need to be separately analyzed and applied to each class member. Overall, plaintiffs have failed to show that common issues predominate over individual ones.

### 2. Superiority of Class Action

Plaintiffs assert that a class action will be more efficient, and more fair to small claimants, than repetitious individual litigation. They argue that a class action would greatly reduce the costs in time and money of conducting discovery, and of presenting expert witnesses and evidence.

In deciding whether a class action is the best way to proceed in a case, the Ninth Circuit has balanced such benefits against the issues that would still need separate trial. If balancing shows that the time and money saved would be insignificant, then "[a] few verdicts followed by settlements might be equally efficacious" in resolving the claims of potential class members. *Dalkon Shield*, 693 F.2d at 856. In addition, "consolidated discovery proceedings, [which] can be expected to become standardized after a few trials", may also reduce costs and relieve excessive litigation burdens on small claimants. *Id.*

As noted above, individual issues will far outweigh the common class issues here. It will be very time consuming to litigate individual issues for a class potentially numbering in the tens of thousands. Any savings of time and costs offered by certification would therefore be insignificant at best.

A well-publicized class action, as this case would be, would also attract excessive claimants with weak to fanciful claims. The plaintiffs' attorneys would have a strong incentive to settle the case, since the money to be awarded as counsel fees may decline after a certain point, and since they would risk receiving no compensation for their representation if the cases ultimately went to trial. This combination of a large number of class members and pressure for early settlement would probably not create a fund large enough to both pay weak claimants, and to fully compensate strong claimants. This may lead strong claimants with more valuable claims to opt out of the class, necessitating trial of both the class action, and the strong cases. *Agent Orange*, 818 F.2d at 166–67.

A class action here would be self-defeating. The prospect of tens of thousands of the people who bought Blockade joining the class would almost certainly lead strong plaintiffs to opt out and pursue their own cases. It is true that there may not be as

many strong plaintiffs in this case as there were in *Agent Orange* and *Dalkon Shield*, where people instead of animals were harmed, and the damages claimed by each plaintiff for injuries and emotional distress were thus necessarily higher than they would probably be here. Nevertheless, the danger that both a class action and many individual claims would need trial here is too great. A class action would not be a very efficient way to dispose of claims arising out of Blockade poisonings. Instead, consolidated discovery proceedings, a few verdicts followed by settlements, or even small claims court would be superior.

### 3. Fed.R.Civ.P. 23(b)(3)(A)–(D)

District courts must also examine the factors in Federal Rule of Civil Procedure 23(b)(3)(A)–(D) when deciding if a class should be certified under Rule 23(b)(3).

#### A. The Interest of Individuals in Controlling Their Own Actions

In *Dalkon Shield,* the Ninth Circuit was concerned that if many parties decided to opt out of the class, then it would be pointless for a class action to proceed. 693 F.2d at 856. Here, in a potentially big class action that could attract many weak or bad faith claims for redress, the key class members with strong cases would have powerful interests in controlling their own actions, and would likely choose to opt out of the class.

#### B. The Extent and Nature of Litigation Involving Class Members and the Controversy at Issue

Courts should examine the nature and extent of other litigation involving class members to see if "[t]he interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action." Fed.R.Civ.P. 23(b)(3) advisory committee's note. Only one other suit involving Blockade has been filed in federal court, and that suit was also filed in the Southern District of California by the same local counsel that represents the plaintiffs here. Since the allegedly harmful effects of Blockade only recently became known, it is impossible to conclude at this time whether or not the lack of other litigation involving potential class members and

Blockade poisoning indicates whether or not a class should be certified here.

#### C. The Desirability of Concentrating the Litigation in the Southern District of California

Relevant to this consideration are the number of other cases involving Blockade poisoning filed in the Southern District of California, *Dalkon Shield,* 693 F.2d at 856, whether potential class members live here, whether witnesses, evidence, or documentation exists here, and whether, because of the diverse citizenship of potential claimants, it would be convenient to other class members to hold the trial here. *Causey v. Pan American World Airways,* 66 F.R.D. 392, 399 (E.D.Va.1975).

One other case involving Blockade poisoning has been filed here. The potential class members are strewn across the United States, since Hartz apparently marketed Blockade nationally. Witnesses and evidence on each class member will thus also be scattered across the country. It is therefore inevitable that conducting a class action here will inconvenience many potential class members.

#### D. Management Difficulties

The complexity and multiplicity of issues in a class action may make it unmanageable. *Dalkon Shield,* 693 F.2d at 856. Here, there will be many problems involving conflicts of law, thousands of claimants, and the need for individual determinations of their claims. This case thus involves significant manageability problems.

#### E. Conclusion

Courts have generally found that, in close cases, it is proper to err in favor of class certification, since a certification decision may always be modified. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) (securities fraud class action); *Jones,* 519 F.2d at 1098 (civil rights class action). This policy is also useful where a decision not to certify a class may hinder the ability of plaintiffs with less valuable claims to prosecute actions. However, this class would present serious problems of commonality, typicality, manageability and predominance, and the plaintiffs have

failed to show that a class action is the best way to proceed here. Plaintiffs' motion to certify a national class is therefore DENIED.

IT IS SO ORDERED.